# No. 23-795

## In the United States Court of Appeals for the Second Circuit

GARTH DRABINSKY,

*Appellant,*

– v. –

ACTORS' EQUITY ASSOCIATION,

*Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO: 1:22-CV-08933-LGS
JUDGE LORNA G. SCHOFIELD**

## BRIEF FOR THE APPELLANT

Molly Donovan
BONA LAW PC
287 Park Avenue South, Ste. 422
New York, NY 10010
(212) 634-6861

Aaron Gott
BONA LAW PC
331 2nd Avenue S. #420
Minneapolis, MN 55401
(612) 284-5001

Luke Hasskamp
Jarod Bona
BONA LAW PC
4275 Executive Square, Ste. 200
La Jolla, CA 92037
(858) 964-4589

Richard Alan Roth
The Roth Law Firm, PLLC, 22nd Floor
295 Madison Avenue
New York, NY 10017
(212) 542-8882

*Counsel Continued on Inside Cover*

Joshua D. Wright
Lodestar Law & Economics, PLLC
1115 Theresa Ann Street
McLean, VA 22101
(571) 977-5501

*Counsel for Appellant Garth Drabinsky*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY STATEMENT ............................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 3

STATEMENT OF THE ISSUES ............................................................. 4

STATEMENT OF THE CASE ............................................................... 6

  *The So-Called "Hostile Work Environment"* ......................... 12

  *The Union Illegally Blacklists Mr. Drabinsky from*
    *Creative Production for Life* ......................................... 14

  *The District Court Erroneously Dismissed Mr.*
    *Drabinsky's Complaint* ................................................ 15

SUMMARY OF THE ARGUMENT ....................................................... 17

STANDARD OF REVIEW ................................................................... 19

ARGUMENT ..................................................................................... 20

 I. THE STATUTORY LABOR EXEMPTION DOES NOT
   BAR MR. DRABINSKY'S FEDERAL ANTITRUST
   CLAIMS .............................................................................. 20

  A. The Statutory Labor Exemption .................................. 21

  B. The Complaint Plausibly Alleges that AEA Did
    Not Act in Its Legitimate Self-Interest ....................... 23

    1. The District Court Erred in Accepting AEA's
     "Wages" Pretext ................................................. 26

i

       2.     The District Court Erred in Accepting AEA's "Working Conditions" Pretext ........................... 29

       3.     AEA's Means Are Not Necessary to Serve a Legitimate End ................................................. 31

       4.     Disputes about a Union's Intent Should Not Be Resolved on a Motion to Dismiss ........... 35

   C.   The Complaint Plausibly Alleges that the Union Combined with a Non-Labor Group ........................... 38

       1.     The Statutory Labor Exemption Does Not Apply When a Union Combines with a Non-Labor Group ............................................... 39

       2.     AEA Combined with Producer-Members, a Non-Labor Group ........................................... 40

II.   MR. DRABINSKY'S STATE LAW CLAIMS SHOULD HAVE SURVIVED; *MARTIN v. CURRAN* DOES NOT PRECLUDE THEM ........................................... 43

   A.   The District Court Improperly Lumped Mr. Drabinsky's Negligence Claims Together with the Intentional Tort Claims ........................................ 44

   B.   In Any Event, the Complaint Allegations Should Satisfy *Martin* ........................................... 45

   C.   *Martin* Should No Longer Be Followed ...................... 48

CONCLUSION ...................................................................... 51

CERTIFICATE OF COMPLIANCE ...................................... 52

CERTIFICATE OF SERVICE ............................................... 53

# TABLE OF AUTHORITIES

**Cases** **Page**

*A & D Supermarkets, Inc. v. United Food & Com. Workers, Loc. Union 880,*
732 F. Supp. 770 (N.D. Ohio 1989)......................................................41

*A. Terzi Prods. v. Theatrical Protective Union*,
2 F. Supp. 2d 485 (S.D.N.Y. 1998)......................................................49

*Adams, Ray & Rosenberg v. William Morris Agency, Inc.*,
411 F. Supp. 403 (C.D. Cal. 1976) .............................................23, 37, 42

*Albrecht v. Kinsella*,
119 F.2d 1003 (7th Cir. 1941)........................................................42, 43

*Allen Bradley Co. v. Elect. Workers*,
325 U.S. 797 (1945)......................................................................39

*Allied Int'l v. Int'l Longshoremen's Ass'n*,
640 F.2d 1368 (1st Cir. 1981) ....................................................... *passim*

*Am. Fed'n of Musicians v. Carroll*,
391 U.S. 99 (1968)................................................................... *passim*

*Am. Med. Ass'n v. United States*,
317 U.S. 519 (1942)..................................................................24, 37

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................20

*C & W Constr. Co. v. Brotherhood of Carpenters & Joiners, Loc. 745,*
687 F. Supp. 1453 (D. Haw. 1988)......................................................23

*Concord Assocs. v. Ent. Props. Tr.*,
817 F.3d 46 (2d Cir. 2016) .............................................................19

*Conley Motor Express, Inc. v. Russell*,
500 F.2d 124 (3d Cir. 1974) ............................................................33

iii

*Connolly v. McCall,*
    254 F.3d 36 (2d Cir. 2001) ...................................... 19

*Cruz v. United Auto. Workers Union Loc. 2300,*
    No. 3:18-CV-0048 (GTS/ML), 2019 U.S. Dist. LEXIS
    119662 (N.D.N.Y. July 18, 2019)................................ 49

*Dixon v. von Blanckensee,*
    994 F.3d 95 (2d Cir. 2021) ...................................... 19

*FTC v. Phoebe Putney Health Sys.,*
    568 U.S. 216 (2013).............................................. 22

*Grahame v. Rochester Tchrs. Ass'n,*
    692 N.Y.S.2d 537 (App. Div. 1999) ............................ 45

*Gregory v. Daly,*
    243 F.3d 687 (2d Cir. 2001) .................................... 19

*Grp. Life & Health Ins. Co. v. Royal Drug Co.,*
    440 U.S. 205 (1979).............................................. 22

*H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n,*
    451 U.S. 704 (1981)..................................... 21, 24, 25, 36

*HBO, Inc. v. DGA, Inc.,*
    531 F. Supp. 578 (S.D.N.Y. 1982)............................... 36

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.,*
    425 U.S. 738 (1976).............................................. 20

*Hunt v. Crumboch,*
    325 U.S. 821 (1945) .......................................36, 37, 39

*Icon at Panorama, LLC v. Sw. Reg'l Council of Carpenters,*
    No. 2:19-cv-00181-CBM(MRWX), 2019 U.S. Dist.
    LEXIS 222597 (C.D. Cal. Aug. 7, 2019) ..................... 38, 41

*Julien v. Soc'y of Stage Dirs. & Choreographers,*
    No. 68 Civ. 5120, 1975 U.S. Dist. LEXIS 15839 (S.D.N.Y.
    Oct. 7, 1975) ................................................... 33

*Klor's v. Broadway-Hale Stores,*
359 U.S. 207 (1959)...............................................20

*Kopec v. Coughlin,*
922 F.2d 152 (2d Cir. 1991)...........................................19

*Lia v. Saporito,*
541 F. App'x 71 (2d Cir. 2013).........................................28

*Madden v. Atkins,*
151 N.E.2d 73 (N.Y. 1958).............................................50

*Martin v. Curran,*
101 N.E.2d 683 (N.Y. 1951)...................................... *passim*

*Medcalf v. Thompson Hine LLP,*
84 F. Supp. 3d. 313 (S.D.N.Y. 2015)................................10

*Modeste v. Loc. 1199, Drug, Hosp. & Health Care Emps.
Union,* 850 F. Supp. 1156 (S.D.N.Y.), *aff'd*, 38 F.3d 626
(2d Cir. 1994) ...............................................................48

*NLRB v. Red Top, Inc.,*
455 F.2d 721 (8th Cir. 1972)...........................................22

*Palladino v. CNY Centro, Inc.,*
12 N.E.3d 436 (N.Y. 2014)..............................................49

*People v. Newspaper & Mail Deliverers' Union,*
683 N.Y.S. 2d 488 (App. Div. 1998), *appeal denied*, 711
N.E.2d 653, 719 N.E.2d 943 (N.Y. 1999)..........................49

*Performing Arts Ctr. v. Actor's Equity Ass'n,*
No. CV 20-2531 (JS) (AYS), 2022 U.S. Dist. LEXIS 153627
(E.D.N.Y Aug. 25, 2022)................................................45

*Perry v. Int'l Transp. Workers' Fed'n,*
750 F. Supp. 1189 (S.D.N.Y. 1990)..............................39, 40

*Piniewski v. Panepinto,*
701 N.Y.S.2d 215 (App. Div. 1999)..................................45

*Republic Prods., Inc. v. Am. Fed'n of Musicians,*
  245 F. Supp. 475 (S.D.N.Y. 1965) ...................................... 36

*Talent Representatives, Inc. v. AFTRA,*
  593 F. Supp. 576 (S.D.N.Y. 1984) ...................................... 23

*Teichmann v. N.Y.C. Emps.' Ret. Sys.,*
  No. 21-CV-5082 (LGS), 2022 U.S. Dist. LEXIS 166249
  (S.D.N.Y. Sept. 14, 2022) ................................................. 10

*Todd v. Exxon Corp.,*
  275 F.3d 191 (2d Cir. 2001) ............................................... 20

*Torres v. Lacey,*
  159 N.Y.S.2d 411 (Sup. Ct. N.Y. Cnty. 1957) .................... 44

*Torres v. Lacey,*
  163 N.Y.S.2d 451 (App. Div. 1957) .................................... 44

*Union Lab. Life Ins. Co. v. Pireno,*
  458 U.S. 119 (1982) ........................................................... 22

*United Mine Workers v Coronado Coal Co.,*
  259 U.S. 344 (1922) ........................................................... 50

*United States v. Hutcheson,*
  312 U.S. 219 (1941) ............................................... 17, 21, 23

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr.
  Trades Council,*
  31 F.3d 800 (9th Cir. 1994) ...................................... *passim*

*William Morris Endeavor Ent., LLC v. WGA, W., Inc.,*
  432 F. Supp. 3d 1127 (C.D. Cal. 2020) ........................ 39, 41

*Zanghi v. Laborers' Int'l Union, AFL-CIO,*
  778 N.Y.S.2d 607 (App. Div. 2004) .................................... 45

**Statutes and Rules**

15 U.S.C. §§ 1–2 ................................................. 16, 20, 39, 43

15 U.S.C. §§ 12–27, as amended .......................................... 4, 21

28 U.S.C. § 1291 ...................................................................... 3

28 U.S.C. § 1331 ...................................................................... 4

28 U.S.C. § 1337 ...................................................................... 4

28 U.S.C. § 1367 ...................................................................... 4

29 U.S.C. § 52 ....................................................................... 21

29 U.S.C. §§ 151–169............................................................. 28

Fed. R. Civ. P. 12.......................................................... *passim*

Fed. R. Civ. P. 56................................................................. 19

Fed. R. Evid. 201 ................................................................. 46

**Other Authorities**

Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 255a (4th and 5th eds., 2023 Cum. Supp. 2016–2022) ......................................................................... 21

N.Y. Gen. Ass'ns Law § 13 (McKinney 1994) .................................. 44, 48

# PRELIMINARY STATEMENT

Defendant-appellee Actors' Equity Association ("AEA")—the union that exclusively represents Broadway performers and stage managers—has publicly instituted a smear campaign and concerted group boycott against plaintiff-appellant, Garth Drabinsky, a renowned creative producer of live theater. AEA's illegal boycott prevents Mr. Drabinsky from working in any producing capacity in theater, film, television, and concerts in perpetuity. Facing AEA's lifetime ban from creating his unique brand of award-winning musical theater, Mr. Drabinsky sued AEA, alleging an unlawful group boycott and conspiracy to monopolize in violation of federal antitrust laws, and defamation, intentional tort, and negligence under New York law.

After a single round of briefing, in which AEA did not deny the alleged conspiracy, the district court granted the union's motion under Rule 12(b)(6) and, without oral argument, dismissed Mr. Drabinsky's claims with prejudice and no opportunity to amend.

In so doing, the district court concluded that the statutory labor exemption bars Mr. Drabinsky's antitrust claim based on ***AEA's*** factual narrative rather than the complaint's well-pleaded facts. But AEA's self-

serving account—that the boycott was intended to respond to purported concerns that **AEA** alleges were about wages and working conditions—is outside the complaint.

The complaint alleges that the boycott was without due process and unjustified by any legitimate union self-interest—that Mr. Drabinsky was ***not*** responsible for wages and **AEA** poisoned the working conditions alleged. The district court should have credited Mr. Drabinsky's alleged facts over AEA's briefs.

The district court was wrong to resolve the factual dispute central to the exemption's application: whether AEA, in fact, intended to serve a legitimate self-interest. The exemption's application is not resolvable on the pleadings where, as here, a union's motives and intent are fact-bound and strongly disputed. This is particularly true for questions tied to antitrust exemptions, which must be applied narrowly.

Likewise, it was reversible error for the district court to apply the statutory labor exemption despite Mr. Drabinsky's allegation that AEA combined with a non-labor group. Although any producer-member of AEA may have functioned in the boycott as a direct competitor of Mr. Drabinsky's—and not as labor—the district court held that "any

members" of a union automatically constitute a "labor group." That is wrong as a matter of law; whether a group, in fact, functioned as a non-labor group cannot be resolved on a motion to dismiss.

Finally, the district court erred in dismissing Mr. Drabinsky's state law claims. The district court lumped Mr. Drabinsky's negligence claim with his intentional tort and defamation claims, dismissing them all under *Martin v. Curran,* 101 N.E.2d 683 (N.Y. 1951). *Martin* articulated the widely criticized rule that certain claims may be asserted against unincorporated associations (like unions) only when "the individual liability of every single member can be alleged and proven," requiring each member to have "expressly or impliedly with full knowledge authorize[d] or ratif[ied] the specific acts in question." *Id.* at 686. The rule does not apply to negligence. Moreover, if Mr. Drabinsky's allegations—that AEA members are required to know and follow the publicly-available "Do Not Work" list or else risk expulsion—do not survive *Martin*, then no set of allegations ever could.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 over this appeal from the district court's order granting defendant's motion to dismiss

with prejudice (A-103), and its final judgment dated April 14, 2023. A-104. Mr. Drabinsky timely filed a notice of appeal on May 11, 2023. A-105.

The district court had subject matter jurisdiction over Mr. Drabinsky's federal antitrust claim under 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 15(a), and supplemental jurisdiction over Mr. Drabinsky's state law claims under 28 U.S.C. § 1367, because they are so related to the federal antitrust claims that they form part of the same case or controversy.

## STATEMENT OF THE ISSUES

1.    Did the district court err in dismissing Mr. Drabinsky's federal antitrust claims as barred by the statutory labor exemption when Mr. Drabinsky's complaint plausibly alleges that AEA did not pursue a legitimate self-interest?

2.    Did the district court err in dismissing Mr. Drabinsky's federal antitrust claims as barred by the statutory labor exemption when Mr. Drabinsky's complaint plausibly alleges that AEA combined with a non-labor group?

3.     Did the district court err in dismissing Mr. Drabinsky's state law tort claims as barred by *Martin*, even though *Martin* does not apply to unintentional torts and Mr. Drabinsky's allegations should suffice to meet the *Martin* test?

4.     Did the district court err in: (i) construing well-pleaded allegations against Mr. Drabinsky; (ii) construing Mr. Drabinsky's well-pleaded allegations in favor of AEA; (iii) resolving factual disputes at the Rule 12(b)(6) stage; and (iv) considering factual content advanced by AEA that is outside the complaint?

# STATEMENT OF THE CASE

Mr. Drabinsky sued AEA for an unlawful boycott and a conspiracy to monopolize in violation of federal antitrust laws, and defamation, intentional tort, and negligence under New York law. The district court (Hon. Judge Lorna G. Schofield) granted AEA's Rule 12(b)(6) motion and dismissed Mr. Drabinsky's claims with prejudice. A-90–103. The district court concluded that the statutory labor exemption bars Mr. Drabinsky's antitrust claims based on facts AEA asserted outside the complaint, and that Mr. Drabinsky's state law claims, including negligence, are precluded under the dated rule first pronounced in *Martin*.

### *The Parties*

Before AEA's boycott, Mr. Drabinsky was the creative power behind many landmark, Tony-winning productions, including *Kiss of the Spider Woman*, Hal Prince's restoration of *Show Boat*, *Ragtime*, *Parade*, *Fosse*, and most recently, *Paradise Square*—a musical that "brings to the forefront the racial conflict in the Five Points neighborhood of New York City in the 1860s." A-10–11, 35 ¶54, 91.

AEA is the union that represents performers and stage managers working in live theater. Virtually all actors and stage managers working

on Broadway or in other professional live theater productions are AEA members. A-17–18 ¶2.

To produce a play or musical on Broadway, a producer or production entity must contract with AEA by signing a security agreement which binds the producer or production entity to the collective bargaining agreement between AEA and the Broadway League (a multi-employer bargaining association of which Mr. Drabinsky is not a member) ("CBA"). A-19 ¶8.

AEA does not dispute that Mr. Drabinsky was not the producer or a principal of the production entity that contracted with AEA on *Paradise Square*. Mem. ISO Def.'s Motion to Dismiss, No. 22-cv-8933, Dkt. 39 (S.D.N.Y. Jan. 10, 2023) (MTD) at 3. Even so, in July 2022, AEA placed Mr. Drabinsky on its "blacklist" (called the "Do Not Work" list), with no known investigation or other due process.

The "Do Not Work" list prohibits AEA members from working on any live theater production with which Mr. Drabinsky is associated as a producer. The blacklist also prevents Mr. Drabinsky from working, as a producer or in any producing capacity, with members of AEA's sister

unions: AGMA, AGVA, GIAA and SAG-AFTRA, collectively known as the Associated Actors and Artists of America, or the "4A's."

In its briefs, AEA assured the district court that its boycott was legitimately based on concerns about wages and working conditions on *Paradise Square*, even though the complaint plausibly alleges those concerns are pretextual.

### Mr. Drabinsky Is Not an Employer and Had No Contractual Obligations to AEA or the Cast for Wages

Mr. Drabinsky did not employ the *Paradise Square* cast. Paradise Square Broadway Limited Partnership and Paradise Square Production Services Inc. ("Production" or "PSPSI") employed the cast and bore sole responsibility for its wages. MTD at 3. Although Mr. Drabinsky served as key creative producer for the show's Chicago and Broadway runs, he was not a principal, partner or shareholder of the Production and he was not the employer for purposes of the CBA. A-36–37 ¶56 ("Drabinsky was the credited lead creative producer of the Musical only for phase two and phase three [of *Paradise Square*]. At no time during any of the three phases of the *Paradise Square* productions was Mr. Drabinsky a partner or member of [the first-phase producer group] or the [Paradise Square Broadway Limited] Partnership or any other of the Musical's legal

entities . . . ."); A-73 ¶191 (Mr. Drabinsky "was never the employer of any member of AEA nor a party to any contract with them. He was not a member of the Broadway League. Further, as set forth above, Mr. Drabinsky was never a principal or partner (or shareholder) of either the Broadway Partnership or PSPSI."). AEA has conceded that Mr. Drabinsky was not an employer on *Paradise Square*. MTD at 3.

Consistent with that, the complaint alleges that Mr. Drabinsky was not responsible for pay. He did not pay wages, or withhold them, because he had no "signing authority on any bank instrument or bank check, nor was he authorized to execute any legal documents on behalf of the various productions of the Musical." A-36–37 ¶56.

The district court should have presumed these facts as true. Instead, the district court ignored them and improperly inferred, in AEA's favor, that AEA's actions are "linked to the union's core goals of maintaining wages" because "Drabinsky purportedly withheld [the cast's] pay." A-101.

Nor did the district court acknowledge that, in a separate litigation relating to *Paradise Square*, AEA sought recovery for withheld dues and benefits in arbitration from ***the Production***; AEA alleged ***the***

**Production** had breached the CBA; **the Production** failed to pay the cast weekly health, pension and 401(k) contributions; and **the Production** failed to remit dues owed to AEA. *See Ass'n v. Paradise Square Prod. Servs., Inc.*, AEA's Petition to Confirm Arbitration Award, No. 22-CV-7325 (PAE), Dkt. No. 4 (Aug. 30, 2022) (S.D.N.Y.) at 4–5 ("*Actors' Equity*") ("Petition to Confirm") (alleging that PSPSI is a member of the Broadway League and had the relevant obligations to comply with AEA's production contract or security agreement).[1]

Until this litigation, as far as Mr. Drabinsky is aware, AEA has never asserted in any prior proceeding or litigation relating to *Paradise Square* that **Mr. Drabinsky** owed or defaulted on any alleged contractual obligation. This includes the many grievances AEA cited in its briefs supporting its petition to confirm the arbitration award—none of which was made against Mr. Drabinsky; they were made against the Production alone. Petition to Confirm at 6–7 (alleging 14 grievances against **the Production**—not Mr. Drabinsky); MTD at 7–8 (identifying

---

1.      This Court may take judicial notice of the court records involving AEA's litigations concerning *Paradise Square. See Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d. 313, 321 (S.D.N.Y. 2015); *Teichmann v. N.Y.C. Emps.' Ret. Sys.*, No. 21-CV-5082 (LGS), 2022 U.S. Dist. LEXIS 166249, at *1–2 (S.D.N.Y. Sept. 14, 2022).

multiple grievances but omitting that none were against Mr. Drabinsky).
Nor does the complaint here allege that Mr. Drabinsky defaulted on any
contractual obligations—he had none.

Contrary to AEA's factual assertions, Mr. Drabinsky is not
somehow synonymous with "the Production." While AEA insisted that
Mr. Drabinsky "effectively controlled" *Paradise Square,* despite not being
an employer, MTD at 1, that narrative contradicts AEA's allegation in
*Actors' Equity* that *Paradise Square* was operated by Mr. Bernard
Abrams. Petition to Confirm at 5 ¶24. In any event, it was improper for
the district court to find facts in resolving a motion to dismiss, and the
district court should have disregarded any purported facts outside
the complaint.

The other assertion AEA made below—that Mr. Drabinsky
functioned as a "controlling" producer because Mr. Drabinsky took part
in hiring a hair supervisor, urged the Production to pay the actors
significantly more than the CBA minimums, or arranged for the cast to
perform at the Tony Awards, among other things, MTD at 4, is a
factual dispute.

### *The So-Called "Hostile Work Environment"*

In October 2021, mere weeks after the start of rehearsals in Chicago where Mr. Drabinsky served as creative producer, Mr. Drabinsky met with the cast to discuss the racial implications of *Paradise Square* ("Show Boat Meeting"). As part of that discussion, Mr. Drabinsky cited the original lyrics in *Show Boat,* written in 1927 by Oscar Hammerstein II, that included the "[n]-word." A-91–92. Mr. Drabinsky explained to the cast that he kept that lyric in his prior production of *Show Boat* years earlier, for rehearsals, and his reasons for so doing—a creative decision that was politically controversial, for which he has been both harassed and applauded, and which Mr. Drabinsky ultimately reversed (excluding the lyric prior to *Show Boat's* opening). *Id.*

AEA attended that meeting and weeks later AEA accused Mr. Drabinsky in a letter of using racial slurs to create a hostile work environment. A-107. The complaint alleges that letter was pretextual. "Drabinsky believed" the meeting "would help strengthen the Cast's resolve to join hands . . . and powerfully convey the Musical's messages to audiences." A-41 ¶75. "AEA knowingly or, in the alternative, negligently, created [the] intentionally fictitious basis upon which to

attack [Mr.] Drabinsky and fan the flames of discontent on the part of certain members of the Cast against [Mr.] Drabinsky." A-42 ¶78. Tellingly, AEA's accusatory letter did not mention that any member of the cast had complained or was offended by the *Show Boat* story. *See id.* (alleging, for example, that AEA took aim against Mr. Drabinsky on an "intentionally fictitious basis").

Throughout the show's tenure, AEA perpetuated an "environment of negativity around the production," including a long series of seemingly automatic grievances against the show, further agitating the cast. A-93. As another example, AEA instructed the cast not to work, knowing that decision was illegal and would result in widespread negative press against Mr. Drabinsky, aggravating the situation more. A-53–54 ¶¶130, 133.

The district court failed to acknowledge these allegations or, as required, presume their truth. Instead, the court adopted *AEA's* purported facts, beyond the complaint, that Mr. Drabinsky created hostile work conditions. A-100–01 ("In *Paradise Square*, AEA's members were supposed to be protected by the CBA, but [Mr.] Drabinsky

purportedly withheld their pay and created a hostile work environment anyway.").

### *The Union Illegally Blacklists Mr. Drabinsky from Creative Production for Life*

Once *Paradise Square* was due to close, on July 14, 2022, the cast purportedly sent a letter to AEA, alleging that Mr. Drabinsky had created a hostile work environment ("July Letter"). A-72 ¶189. On or around that same day, AEA announced publicly that it was blacklisting Mr. Drabinsky from working as a producer or in any producing capacity on any project that employs unionized stage actors. A-72–73 ¶190.

The district court assumed facts outside the complaint when it concluded that the cast sent the July Letter and "then" AEA blacklisted him. A-93. The complaint does not allege which came first, or that the boycott was, in fact, intended as a response to the purported July Letter. That is **AEA's** narrative, which the district court improperly treated as true even though this is a central factual dispute to be resolved at trial.

The district court erroneously concluded that the blacklist merely "discourag[es]" actors from working with Mr. Drabinsky. A-101–02. This contradicts both the complaint and reality because AEA's "Do Not Work" website warns that members "face union discipline and risk losing your

membership for any violation" of the "Do Not Work" list. A-136. Contrary to the district court's order, the blacklist is a strict prohibition and union members who accept theatrical employment with individuals on the "Do Not Work" list risk severe consequences. For purposes of this appeal, however, it is sufficient that the complaint alleges that AEA's placement of Mr. Drabinsky on the "Do Not Work" list is a concerted refusal by AEA and its members to work with Mr. Drabinsky as a producer or in any producing capacity. A-87–88 ¶247.

Besides being threatening to members, the scope of AEA's boycott is very broad. It extends beyond the stage, to film, television, and concerts, because AEA's sister "4A" unions—representing all performers in "television, radio, concerts and film"—honor AEA's "Do Not Work" list. A-21 ¶194.

AEA's boycott is also unlimited as to time; it prevents Mr. Drabinsky from making a living in perpetuity as a producer.

### The District Court Erroneously Dismissed Mr. Drabinsky's Complaint

Mr. Drabinsky sued AEA on October 20, 2022, initially alleging three causes of action for defamation, intentional tort, and negligence

under New York law. Compl., No. 22-cv-8933, Dkt. 1 (S.D.N.Y. Oct. 20, 2022).

Following an initial round of letters to the district court, Mr. Drabinsky subsequently amended his complaint to add two federal antitrust claims: (i) an unlawful boycott in violation of Section 1 of the Sherman Act; and (ii) an unlawful conspiracy to monopolize in violation of Section 2 of the Sherman Act. *See* A-10–89.

AEA moved to dismiss the complaint on the grounds that: (i) the statutory labor exemption bars the antitrust claims; (ii) the non-statutory labor exemption bars the antitrust claims; (iii) Mr. Drabinsky has not alleged antitrust injury; (iv) the state law claims are precluded under *Martin*; (v) the state law claims are preempted; and (vi) the state law claims are duplicative of one another or otherwise fail as a matter of law.

The district court did not hold oral argument but, in a short 14-page opinion, granted AEA's motion as to grounds (i) and (iv), without reaching the remaining issues, and dismissed Mr. Drabinsky's 80-page five-count complaint in its entirety without leave to amend but with prejudice.

## SUMMARY OF THE ARGUMENT

The statutory labor exemption does not immunize union activity from antitrust scrutiny every time *a union* self-brands its conduct as relevant to "wages [and] working conditions." Instead, the district court's duty, on a motion to dismiss, is to determine whether *the complaint* plausibly alleges that the exemption does not apply because the union's activity did not serve a legitimate self-interest or because the union combined with a non-labor party. *United States v. Hutcheson*, 312 U.S. 219, 232–33 (1941); *Allied Int'l v. Int'l Longshoremen's Ass'n*, 640 F.2d 1368, 1380 (1st Cir. 1981) (a union's activities must "bear a reasonable relationship to a legitimate union interest").

But the district court did not do that here. It dismissed Mr. Drabinsky's antitrust claims based on facts outside the complaint that largely contradict the complaint's allegations. The district court construed facts in AEA's favor and resolved the ultimate fact dispute whether AEA acted in its legitimate self-interest by accepting *AEA's* assertion—not in the complaint—that the boycott was "in response" to the July Letter. A-97 ("That boycott was allegedly in response to a letter from the Paradise Square cast to AEA.").

The complaint does not allege that the July Letter preceded or caused the boycott. The complaint alleges that the boycott was without a legitimate self-interest; wages and working conditions were merely pretexts. *See, e.g.*, A-73 ¶¶191–92. While the district court should have presumed those facts to be true, it decided instead that "[i]t is not for . . . a court to say that AEA's actions are not in its self-interest." A-100. But that is exactly what courts do—though not on the pleadings, and not when the pleadings plausibly allege the absence of a legitimate union objective.

Likewise, with respect to AEA's alleged combination with a non-labor group (producer-members of AEA who, in addition to being actors and stage managers, also directly compete with Mr. Drabinsky to produce), the district court erroneously rejected those allegations based on the incorrect legal holding that the producers' mere membership in AEA is dispositive. It is not, and whether AEA combined with a "non-labor" group is fraught with factual disputes regardless.

Finally, the district court held that Mr. Drabinsky's state law claims—including negligence—are barred by *Martin* even though that decision has "long been criticized" and does not apply to unintentional

torts. A-95. The court reasoned that the complaint "does not sufficiently allege authorization or ratification" of AEA's challenged conduct by all 50,000-plus of its members. *Id*. But Mr. Drabinsky's allegations that AEA requires its members to know and strictly follow the "Do Not Work" list, or else risk expulsion, does (or ought to) meet that test, at least on the pleadings.

## STANDARD OF REVIEW

Appellate courts review the grant of a defendant's Rule 12(b)(6) motion to dismiss *de novo*. *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001). The Court must construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true. *Connolly v. McCall*, 254 F.3d 36, 40 (2d Cir. 2001). "[T]here is no heightened pleading standard in antitrust cases." *Concord Assocs. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016). As with any other case, a court must draw all reasonable inferences in the plaintiff's favor and factual content outside the complaint must be disregarded. *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021); *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991) (unless a 12(b)(6) motion is converted to a Rule 56 motion, the court must

exclude material outside the complaint and decide the motion on the complaint alone).

"A complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 197–98 (2d Cir. 2001). Indeed, "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 586–87 (2007) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

## ARGUMENT

## I. THE STATUTORY LABOR EXEMPTION DOES NOT BAR MR. DRABINSKY'S FEDERAL ANTITRUST CLAIMS

AEA's blacklisting of Mr. Drabinsky constitutes an unlawful group boycott and an unlawful conspiracy to monopolize in violation of Sections 1 and 2 of the Sherman Act. Concerted group boycotts are *per se* violations of Section 1 no matter the claimed justification. *See, e.g., Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 210–14 (1959) (concerted group

boycott is illegal *per se* and evidence that the agreement injured only one competitor was beside the point).

### A.     The Statutory Labor Exemption

In certain cases, a union's activities are exempted by statute from federal antitrust laws under the "statutory labor exemption." Section 6 of the Clayton Act declares that human labor "is not a commodity or article of commerce," and immunizes from antitrust liability labor organizations and their members "lawfully carrying out [their] legitimate object[ives]." 15 U.S.C. § 17; *see also* 29 U.S.C. § 52.

The exemption has limits. It applies only "so long as a union acts in its self-interest and does not combine with non-labor groups." *Hutcheson*, 312 U.S. at 229–32; *see also* Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 255a (4th and 5th eds., 2023 Cum. Supp. 2016–2022) ("[T]he exemption is not complete, and its dimensions have been much litigated."); *H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 711 (1981) (holdings and findings of district court occurred after a bench trial).

Like all exemptions from antitrust liability, the statutory labor exemption should be construed narrowly. *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979); *Union Lab. Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982) ("[O]ur precedents consistently hold that exemptions from the antitrust laws must be construed narrowly. This principle applies not only to implicit exemptions, but also to express statutory exemptions."); *FTC v. Phoebe Putney Health Sys.*, 568 U.S. 216, 225 (2013) ("given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, 'state-action immunity is disfavored'") (citations omitted).

And the applicability of an antitrust exemption is ill-suited to resolution on a motion to dismiss, particularly where the union's motive behind a concerted group boycott is disputed—as questions of motive and intent are inherently fact bound. *See, e.g., NLRB v. Red Top, Inc.*, 455 F.2d 721, 725–26 (8th Cir. 1972) (the motive of an employee is relevant in determining whether he engaged in protected concerted activity); *Allied Int'l*, 640 F.2d at 1379–82 (the political motivation behind a group boycott removed it from the labor exemption's protection); *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*, 31 F.3d 800,

809–10 (9th Cir. 1994) (plaintiff was "entitled to try to raise a triable issue of fact on [whether union acted in its self-interest]"); *C & W Constr. Co. v. Brotherhood of Carpenters & Joiners, Loc. 745*, 687 F. Supp. 1453, 1464 (D. Haw. 1988) (the application of the statutory labor exemption depends on discerning the union's "primary purpose" in picketing); *Adams, Ray & Rosenberg v. William Morris Agency, Inc.*, 411 F. Supp. 403, 411 (C.D. Cal. 1976) (agency's preliminary injunction motion "raises numerous factual issues" about whether the labor exemptions apply "which must be resolved at trial"); *Talent Representatives, Inc. v. AFTRA*, 593 F. Supp. 576, 579 (S.D.N.Y. 1984) (holding that issues of fact as to "intent or purpose" preclude summary judgment on a labor exemption defense).

### B. The Complaint Plausibly Alleges that AEA Did Not Act in Its Legitimate Self-Interest

The antitrust laws do not immunize all anticompetitive activity that a union considers to be in its "self-interest." To qualify for the statutory labor exemption, a court must find that a union acted with the intent to serve a ***legitimate*** self-interest: "In the broadest sense, everything a union does serves its self-interest. But *Hutcheson* requires that it act in pursuit of its ***legitimate*** self-interest," with "legitimate"

defined in a precise way. *USS-POSCO*, 31 F.3d at 808. "Whether the interest in question is legitimate depends on whether the ends to be achieved are among the traditional objectives of labor organizations." *Id.*; *see also Allied Int'l*, 640 F.2d at 1380 (the union's activities must "bear a reasonable relationship to a legitimate union interest"); *H.A. Artists*, 451 U.S. at 721–22. To determine this, courts examine whether the challenged conduct "in actuality" protected the wages, hours, or working conditions of union members—or served only illegitimate ends. *See generally Am. Fed'n of Musicians v. Carroll*, 391 U.S. 99, 107–08 (1968).

A politically motivated boycott does not serve a legitimate union interest. *Allied Int'l,* 640 F.2d at 1379–82. Nor does nepotism, *USS-POSCO*, 31 F.3d at 808, or a naked desire to prevent members from taking employment with a particular employer. *Am. Med. Ass'n v. United States*, 317 U.S. 519, 535–36 (1942) (The defendants "were interested in the terms and conditions of employment only in the sense that they desired wholly to prevent Group Health from functioning by having any employees. Their objection was to its method of doing business.").

Additionally, even if the goal is "well within the legitimate interests of labor unions," the end also must be "pursued by activities normally

associated with labor disputes." *USS-POSCO*, 31 F.3d at 809. If the goal is pursued through more "troublesome . . . activities," such as "agitating" the plaintiff to make an example of him, by pressing frivolous complaints against the plaintiff or by automatically protesting the plaintiff, the conduct is not *per se* protected. *Id*. Such activity must be "lawful" **and** "necessary because the goals could not be achieved through traditional tactics." *Id*.

The union bears the substantial burden to show this—and not through inferences impermissibly drawn in the union's favor on a motion to dismiss. *See also H.A. Artists*, 451 U.S. at 722 (holding that union's "justification" for non-traditional union activity of extracting franchise fees from agents was "inadequate"); *Carroll*, 391 U.S. at 112 (price-list requirement imposed by union must be "necessary" to accomplish union's legitimate objective); *USS-POSCO*, 31 F.3d at 809 ("pursuing legitimate labor goals through" nontraditional activity, "such as pressing frivolous lawsuits . . . to make an example of [plaintiff]," is not "*per se* exempted from the antitrust laws").

The complaint here alleges that AEA's boycott cannot be explained by wages or working conditions: to the contrary, the boycott is unjustified

by any legitimate union self-interest. Mr. Drabinsky had no contractual obligations to the cast or to the union and he was not otherwise responsible for pay. Mr. Drabinsky does not allege that the July Letter regarding "working conditions" was the impetus for the boycott.

The factual question whether AEA's intent was based on legitimate self-interests (contrary to the complaint), or on political or personal animus, or a naked desire to eliminate Mr. Drabinsky from producing or acting in any producing capacity on Broadway, should proceed to discovery.

### 1. The District Court Erred in Accepting AEA's "Wages" Pretext

The district court accepted facts outside the complaint, finding that "AEA asserted a grievance *against [Mr.] Drabinsky* for failing to provide cast members with proper contracts" and for "violating *his* agreement to abide by AEA's collective bargaining agreement." A-92 (emphases added).

Those "facts" found by the district court are not in the complaint because they are untrue. AEA did not assert grievances against *Mr. Drabinsky*; the grievances were asserted against the *Production*. Mr. Drabinsky had no agreement with AEA, and he is not a party to the

collective bargaining agreement—a point AEA conceded. A-36–37 ¶56, 73 ¶191. Apart from being untrue, the facts found by the district court conflict with Mr. Drabinsky's complaint, which alleges that Mr. Drabinsky had no contractual obligations to AEA or to the cast because it was solely the ***Production's*** contractual responsibility to make timely wage payments. A-36–37 ¶56.

While those allegations should have been presumed true, the Court need not give Mr. Drabinsky the benefit of the doubt. When AEA pursued withheld dues and benefits in arbitration, it did not name Mr. Drabinsky as a party. *See generally* Petition to Confirm. Instead, it sought recovery only from the Production. Nor does AEA's petition for confirmation of the arbitration award assert that Mr. Drabinsky had any contractual obligations or was otherwise responsible for withheld monies—indeed, Mr. Drabinsky is not mentioned in the petition. AEA alleged that this was the responsibility of the *Paradise Square **Production*** alone. *Id.* at 4–5.

Thus, Mr. Drabinsky alleges that withheld pay is a mere pretext that AEA asserted for the first time to the district court because its interests have changed. But AEA cannot have it both ways—asserting

successfully in one proceeding that the ***Production*** had the relevant contractual obligations, while flipping the script here by insisting that ***Mr. Drabinsky*** did. *See Lia v. Saporito*, 541 F. App'x 71, 73 (2d Cir. 2013) (a "party who 'assume[d] a certain position in a legal proceeding[s], and succeeds in maintaining that position' can be judicially estopped from assuming a contrary position thereafter simply because his interests have changed.") (citations omitted).

Perhaps AEA's bait and switch is most obvious here:

> [AEA] is continuing to arbitrate and litigate its claims resulting from ***Paradise Square's breach*** of the collective bargaining agreement. Its attempts to fulfill its statutory mandate under the NLRA to represent its members should not be stymied by a ***defaulting producer*** seeking to avoid ***his*** contractual obligations by filing a baseless lawsuit.

MTD at 3 (emphases added). In one breath, AEA correctly assigns the contractual defaults to the Production, and in the next, makes the stealth substitution of Mr. Drabinsky. The sleight of hand may be subtle, but it was deadly to Mr. Drabinsky below because: (i) the district court construed ***AEA's*** made-up "facts" to be true; and (ii) the district court impermissibly considered these factual assertions at all despite their absence from the complaint.

In sum, the complaint brims with allegations that Mr. Drabinsky never owed contractual pay to the cast and AEA's use of "withheld pay" to boycott is, therefore, a guise. The district court's decision to resolve the factual dispute—whether AEA's excuse is, in fact, pretextual—on the pleadings was erroneous.

### 2. The District Court Erred in Accepting AEA's "Working Conditions" Pretext

As with wages, the district court adopted *AEA's* narrative that the "boycott was allegedly in response to a letter from the *Paradise Square* cast to AEA" about "hostile and unsafe work environment and unpaid wages and benefits." A-97.

That account is unfaithful to the complaint. Mr. Drabinsky did *not* "specifically allege[] that [AEA]'s 'boycott' was a response to its members' complaints about the production's work environment and failure to pay wages and benefits"—it was AEA's briefing that advanced that narrative. MTD at 19–20 (citing A-72 ¶189 & A-122–26) (merely quoting the July Letter but not alleging that the boycott stemmed from that letter or to any other complaint against Mr. Drabinsky that originated with the cast).

To the contrary, the complaint alleges that "AEA did ***not*** boycott [Mr.] Drabinsky for failing to agree with the key terms of labor negotiations, such as wages, working hours, or other working conditions. . . . ***AEA's blacklist [of Mr. Drabinsky] was [] unjustified*** . . . . " A-72–73 ¶¶190–91 (emphasis added).

As for the July Letter specifically, Mr. Drabinsky simply alleges that, on July 14, 2022, the cast wrote a letter to AEA and, on the same day, AEA blacklisted him. A-72 ¶189. Mr. Drabinsky does not allege cause and effect—it requires inferences from the complaint to resolve fact questions such as whether the letter preceded the boycott or prompted it; whether the letter was agitated by AEA; when the letter was drafted or by whom; and when or why AEA first decided to blacklist Mr. Drabinsky—perhaps months, even years, earlier. The district court was wrong to draw those inferences in AEA's favor and against Mr. Drabinsky.

The complaint plausibly alleges that AEA's intent, long before the July Letter, was to agitate the cast against Mr. Drabinsky for fictitious reasons. *See, e.g.,* A-42 ¶¶77–78. Mr. Drabinsky alleges, for example, that he was first aware of the "hostile work environment" claims on October

2, 2021, following the Show Boat Meeting that ***AEA*** attended and ***AEA*** criticized by a defamatory letter. That letter does not suggest ***the cast*** had complained or that ***the cast*** felt hostility. A-107. This incident was mere weeks after the start of rehearsals in Chicago with the *Paradise Square* Chicago cast and well before any performances—plausibly suggesting that AEA was already intent on eliminating Mr. Drabinsky for reasons unrelated to actual working conditions.

It is evident, even now, that AEA strongly dislikes Mr. Drabinsky. In its district court briefing, AEA called Mr. Drabinsky "disgruntled" and harped on his prior conviction in Canada, for no apparent reason other than maligning him personally. MTD at 5–6. The 15-year-old conviction under Canadian law has nothing to do with performers, working conditions, or the cast's wages.

The alleged facts are more than plausible that "working conditions" was an AEA excuse to have Mr. Drabinsky eliminated from creative production in perpetuity for no legitimate reason.

### 3.  AEA's Means Are Not Necessary to Serve a Legitimate End

Even if a union's ends are legitimate, courts also scrutinize whether the means used to achieve them are necessary: "[T]he means employed

by the union bear on the degree of scrutiny we will cast on the legitimacy of the union's interest . . . . Where the union's activities are farther afield, the scrutiny is more searching." *See USS-POSCO*, 31 F.3d at 808–09; *see also Carroll*, 391 U.S. at 112 ("[T]he price-list requirement is brought within the labor exemption under the finding that the requirement is necessary to assure that scale wages will be paid to the sidemen and the leader.").

Here, the complaint alleges that a lifelong boycott of Mr. Drabinsky working as a producer or acting in any producing capacity in virtually any entertainment field cannot be necessary to protect legitimate union interests. The district court was wrong that the scope of the boycott is a mere quibble regarding its "wisdom or unwisdom." A-100. The boycott's scope goes to the necessity of the means (a point on which the union bears the burden) and casts additional doubt that AEA's claimed self-interest in "working conditions" is legitimate. Productions involving Mr. Drabinsky, in a creative producing role having nothing to do with wages or the actors, would not implicate AEA's professed concerns.

Moreover, Mr. Drabinsky is a non-employer. That fact also goes to the unprecedented nature of this boycott, and to the plausibility of AEA's

claimed objective—to protect wages and working conditions—considering that Mr. Drabinsky, like any non-employer, has no contractual control over those matters. *Conley Motor Express, Inc. v. Russell*, 500 F.2d 124, 126 (3d Cir. 1974) ("appellants have nonetheless not shown the primary prerequisite for exemption from the anti-trust laws, i.e., that their dispute with Conley involves an employer-employee relationship"); *see generally Julien v. Soc'y of Stage Dirs. & Choreographers*, No. 68 Civ. 5120, 1975 U.S. Dist. LEXIS 15839, at *4–5 (S.D.N.Y. Oct. 7, 1975) (after trial, analyzing the nature of the claimed employer-employee relationship, given the complex facts of theatrical-industry relationships, to determine the exemption's application).

AEA will argue that, despite not being an employer, Mr. Drabinsky was "effectively [in] control[]" on *Paradise Square*. MTD at 1. The district court erred to the extent it credited that characterization and "control" is a quintessential question of fact not susceptible to resolution on the pleadings. *Julien*, 1975 U.S. Dist. LEXIS 15839, at *7–8 (whether a producer has "final control" analyzed as a question of fact after trial). Plus, AEA's characterization is directly contradicted by positions it has taken in other litigation where it alleged that *Paradise Square* was

"operated by producer Bernard Abrams"—not by Mr. Garth Drabinsky. Petition to Confirm at 5.

Additionally, at least with respect to actors, AEA has repudiated blacklisting, declaring it unacceptable as a means to improve working conditions particularly without investigation: "The League and [AEA] both pledge themselves to use their best efforts to prevent blacklisting in the theater. The opposition to blacklisting is not a controversial issue between the League and [AEA]." A-203 ¶9. AEA flip-flops here to suit its changing needs: in one instance precluding blacklisting without due process; in the next it is freely allowed.

The boycott's detrimental effect on AEA members further confirms that the union's means are dubious. If Mr. Drabinsky were hired to consult as to creative production on a preexisting show that fully complies with the CBA, the AEA's "Do Not Work" list would require all AEA members to walk off the stage or set. It strains credulity and cannot be in the self-interest of AEA members to end a CBA-compliant job where wages are paid and working conditions are favorable.

Finally, AEA's course of conduct is illegal (at worst) and troubling (at best): Mr. Drabinsky alleges that AEA agitated the cast against him

and engaged in a "pattern of conduct to maliciously defame and harm" him, speciously blaming him, even now, for nonpayment of wages, despite alleging otherwise in prior litigation. A-17. Mr. Drabinsky alleges that AEA instituted an illegal work stoppage to agitate or protest him. A-51–54 ¶¶120–31. Mr. Drabinsky alleges that AEA *disclaimed* responsibility to ensure safe working conditions when a *Paradise Square* cast member was accused of sexual harassment: "it is the employer's responsibility to provide a workplace free of harassment, discrimination and bullying." A-44 ¶85. And in an about face, AEA *reclaimed* responsibility for safe working conditions when its interests changed in this litigation, i.e.*,* to justify Mr. Drabinsky's ban.

AEA's changing positions reflect the dubiousness with which AEA has behaved throughout the *Paradise Square* ordeal and reinforce the plausibility of Mr. Drabinsky's factual allegations that AEA's claimed intent is a pretext and otherwise illegitimate.

### 4. Disputes about a Union's Intent Should Not Be Resolved on a Motion to Dismiss

In support of its determination that AEA acted in its legitimate self-interest, the district court cited eight decisions. But in none of them was an antitrust claim dismissed on the pleadings based on a union's self-

serving assurance that its intent was *bona fide*. Indeed, nearly all involved a full record on summary judgment or after trial. *See, e.g., H.A. Artists*, 451 U.S. at 711 (determining the application of the labor exemptions after a trial); *HBO, Inc. v. DGA, Inc.*, 531 F. Supp. 578, 593–97 (S.D.N.Y. 1982) (same); *Hunt v. Crumboch*, 325 U.S. 821, 823 (1945) (same); *Republic Prods., Inc. v. Am. Fed'n of Musicians*, 245 F. Supp. 475, 476 (S.D.N.Y. 1965) (same). The one pleadings decision the district court did rely on is *Allied International* where the First Circuit concluded that a politically-motivated boycott was ***not*** exempted from antitrust liability. 640 F.2d at 1380.

The district court cited *Hunt* for the proposition that even if the boycott were based on personal or political animus only, it is still legitimate. But *Hunt* does not suggest that the legitimacy of a union's motivations can be resolved on the pleadings. There, union members refused to work for an employer (unlike Mr. Drabinsky) who would not unionize and who attempted to continue operations during a strike. The maintenance of a "closed shop" was held to be a legitimate self-interest—after a trial. That personal antagonism was also involved went to the "wisdom" or "selfishness" of the union's conduct—not whether it served a

legitimate end to begin with. At bottom, the employer in *Hunt* was boycotted because he refused to comply with the wage and hour conditions in the relevant CBA. 325 U.S. at 825–26. The boycott of Mr. Drabinsky has no such justification.

Nor have later courts read *Hunt* to suggest that a union's motive is irrelevant in determining whether the exemption applies. To the contrary, the Supreme Court's subsequent decision in *Carroll* rejects *Hunt's* "expansive approach to determining union self-interest" and analyzed "in great detail whether the challenged agreement actually protected the wages, hours or working conditions of union members." *Adams*, 411 F. Supp. at 409–10 (citing *Carroll*, 391 U.S. at 107–10, 112). It is improper to perform that analysis on the pleadings and the district court did not acknowledge the required analysis in any event. Finally, the district court ignored its earlier citation to *Allied International*, which held that a union's activities must "bear a reasonable relationship to a legitimate union interest." 640 F.2d at 1380 (quoting *Adams*, 411 F. Supp. at 410).

By contrast, a naked desire to run an individual out of business in perpetuity is ***not*** legitimate, *American Medical*, 317 U.S. at 534–36, and

when alleged, should not be resolved on a motion to dismiss. For example, in *Icon at Panorama, LLC v. Southwest Regional Council of Carpenters*, the district court denied a motion to dismiss based on the statutory labor exemption after concluding that the plaintiff had pled that the union had not acted in a legitimate self-interest. No. 2:19-cv-00181-CBM(MRWX), 2019 U.S. Dist. LEXIS 222597, at *13–14 (C.D. Cal. Aug. 7, 2019) (An interest is legitimate "so long as this end is pursued by activities normally associated with labor disputes . . . . However, the goal cannot be pursued via 'more troublesome' activities.").

## C. The Complaint Plausibly Alleges that the Union Combined with a Non-Labor Group

Even if a union pursues a legitimate self-interest, the statutory labor exemption does not apply if the union combines with a non-labor group. Here, as alleged, AEA combined with union members who are also producers, and thus competitors of Mr. Drabinsky. These members are a non-labor group, and the district court erred in ruling otherwise as a matter of law.

### 1. The Statutory Labor Exemption Does Not Apply When a Union Combines with a Non-Labor Group

"To constitute a non-labor group for purposes of the statutory labor exemption . . . the entity in question must operate in the same market as the plaintiff to a sufficient degree that it would be capable of committing an antitrust violation against the plaintiff, quite independent of the union's involvement." *USS-POSCO*, 31 F.3d at 806. "A competitor of the plaintiff clearly falls within the definition of a non-labor group, as would a supplier or purchaser of the plaintiff's goods or services." *William Morris Endeavor Ent., LLC v. WGA, W., Inc.*, 432 F. Supp. 3d 1127, 1136–38 (C.D. Cal. 2020); *USS-POSCO*, 31 F.3d at 806 (citing *Allen Bradley Co. v. Elect. Workers*, 325 U.S. 797, 811 (1945) ("Congress evidently concluded that the chief objective of Anti-trust legislation, preservation of business competition, could be accomplished by applying the legislation primarily only to those business groups which are directly interested in destroying competition.")); *Hunt*, 325 U.S. at 824 ("Had a group of petitioner's business competitors conspired and combined to suppress petitioner's business by refusing to sell goods and services to it, such a combination would have violated the Sherman Act. A labor union

aided and abetted by such a group would have been equally guilty.")
(citation omitted).

Certainly, "one group of employers may not conspire to eliminate
competitors from the industry," and a union is liable "if it becomes a party
to that conspiracy, even though the union's part in the scheme may
consist of an undertaking to secure the same wages, hours or other
conditions of employment from the remaining employers in the industry."
*Perry v. Int'l Transp. Workers' Fed'n*, 750 F. Supp. 1189, 1199
(S.D.N.Y. 1990).

### 2. AEA Combined with Producer-Members, a Non-Labor Group

The complaint alleges that producers-members—direct competitors
of Mr. Drabinsky for finite theater space, writers, composers, and other
talent—may constitute a "non-labor group" for purposes of the boycott.
A-75 ¶¶195–98 (also alleging that fewer producers results in less
competition when they set ticket prices). Any producers that are
members of AEA or the 4A unions have a natural interest in suppressing
competition among producers, including by the boycotting of competing
producers (particularly, critically acclaimed and multi-award-winning
creative producers who may have a competitive edge). No doubt such

producer-members exist. For example, Bette Midler, Whoopi Goldberg, and Cher are members of performers' unions, including AEA, who have served as producers as well.

Other courts have denied motions to dismiss when similar allegations to those raised by Mr. Drabinsky have been pled. *See, e.g., William Morris*, 432 F. Supp. 3d at 1136–38 ("Because Plaintiffs' factual allegations raise a plausible inference that Defendants have combined with a nonlabor group in enforcing the Code of Conduct, the Court concludes that Plaintiffs have met their burden of pleading facts showing that the statutory labor exemption does not apply to Plaintiffs' claims."); *Icon at Panorama*, 2019 U.S. Dist. LEXIS 222597, at *12–13 ("Clear examples of non-labor groups are plaintiff's competitors or suppliers."); *A & D Supermarkets, Inc. v. United Food & Com. Workers, Loc. Union 880*, 732 F. Supp. 770, 773 (N.D. Ohio 1989) ("The Court finds that the plaintiffs have adequately alleged a conspiracy existing between the defendant union and a non-labor group, the co-conspirator union supermarkets, such that the statutory exemption, applicable only to labor entities acting alone or in combination with other labor entities, does not apply.").

Yet the district court dismissed Mr. Drabinsky's allegations, holding: "[A]ny members of the 4As who might also work as producers still constitute a 'labor group' for purposes of the statutory exemption, because they compete with the 4A members who are only actors or stage managers." A-102-03 (citing *Carroll*, 391 U.S. at 109–10).

This is wrong. *Carroll* did not suggest that who comprises a "labor" or "non-labor" group is resolvable on the pleadings. Instead, *Carroll* followed a five-week trial examining the "actual[ity]" of the complex economic relationships at issue involving a group (orchestra leaders) that potentially functioned as both employer and employee. 391 U.S. at 105–06. *Adams* confirms that the *Carroll* inquiry, i.e., who functioned (or not) as a "labor group" in relation to the challenged conduct, is a factual one and not susceptible to resolution on a motion to dismiss. *Adams*, 411 F. Supp. at 409 (whether the Guild is in an economic interrelationship with managers—such that the latter constitutes a non-labor group—is a fact question to be resolved at trial by examining economic realities).

In any event, the district court was mistaken that the producers' membership in the performers' union automatically confers the exemption's protection:

> When officials of the labor union step outside their union labor fields . . . acting for their individual gain, the immunity granted to labor unions under the amendment to the Sherman Act does not extend to them. They are not acting as labor unions except in name. The test is whether the activity complained of is one promotive of, and within the scope of, the legitimate objects of a labor union or whether the union is being misused by those holding official position or positions of trust therein, who, conspiring for their private and their personal profit, are using the union name to obtain immunity from Sherman Act prosecutions and at the same time shield their misconduct behind an organization whose fair name and activities are likely to mislead a court or jury as well as the public.

*Albrecht v. Kinsella*, 119 F.2d 1003, 1004–05 (7th Cir. 1941).

The question whether producer-members who combined with AEA in boycotting Mr. Drabinsky are a non-labor group is a factual one that the district court erroneously resolved on the pleadings.

## II.   MR. DRABINSKY'S STATE LAW CLAIMS SHOULD HAVE SURVIVED; *MARTIN v. CURRAN* DOES NOT PRECLUDE THEM

The oft-criticized rule of *Martin* is that certain lawsuits can stand against unincorporated associations only in the rarest of cases in which "the individual liability of every single member can be alleged and proven," requiring each member to have "expressly or impliedly with full knowledge authorize[d] or ratif[ied] the specific acts in question." 101

N.E.2d at 686 (citation omitted). The rule—besides being outdated—is not complete: it does not apply to all torts—only intentional ones.

## A. The District Court Improperly Lumped Mr. Drabinsky's Negligence Claims Together with the Intentional Tort Claims

The district court ignored that Mr. Drabinsky alleged a distinct negligence claim and that *Martin* is inapplicable to unintentional torts. In *Torres v. Lacey*, the court held that "[i]f it were necessary to plead membership ratification or authorization of an unintentional tort, other than alleging that the event was in furtherance of the association's existence, then an aggrieved party would be placed thereby in the position of pleading, in effect, a willful or intentional wrong, substantially altering substantive rights which was not within the contemplation of section 13 of the General Associations Law." 159 N.Y.S.2d 411, 413 (Sup. Ct. N.Y. Cnty. 1957). The Appellate Division confirmed: "to require membership authorization or even ratification of such an unintentional tort is, in effect, to attempt to transmute a negligent act into a willful wrong. This is an inadmissible result, straining both law and logic." *Torres v. Lacey*, 163 N.Y.S.2d 451, 452 (App. Div. 1957).

Likewise, more recent decisions hold that the *Martin* rule does not apply to negligence. *See Piniewski v. Panepinto*, 701 N.Y.S.2d 215, 1088 (App. Div. 1999); *Grahame v. Rochester Tchrs. Ass'n*, 692 N.Y.S.2d 537 (App. Div. 1999); *Zanghi v. Laborers' Int'l Union, AFL-CIO*, 778 N.Y.S.2d 607, 608 (App. Div. 2004). And AEA knows this: a federal court very recently concluded that *Martin* did not bar a negligence claim against the union where individual plaintiffs alleged that AEA had negligently misrepresented that their benefits would be covered by the relevant collective bargaining agreement. *Performing Arts Ctr. v. Actor's Equity Ass'n*, No. CV 20-2531 (JS)(AYS), 2022 U.S. Dist. LEXIS 153627, at *18 (E.D.N.Y Aug. 25, 2022) ("Plaintiffs correctly argue that *Martin* does not apply to the Individual Plaintiffs' negligent misrepresentation claim."). Thus, at the very least, the dismissal of the negligence claim should be reversed and that claim remanded.

**B.    In Any Event, the Complaint Allegations Should Satisfy *Martin***

Mr. Drabinsky's allegations satisfy *Martin*, particularly given the size and functioning of modern-day unions that communicate with members—not in town-hall meetings, but digitally via the internet or other electronic means. Any reading of the complaint would lead to a

reasonable inference that AEA members impliedly, with full knowledge, authorized the creation of the "Do Not Work" list and the placement of Mr. Drabinsky on that list. AEA members have delegated their authority to small councils and committees to operate the union on their behalf with the members deemed to have knowledge of the actions taken by these groups which they have so authorized.[2]

The complaint alleges that the union publishes and maintains a "Do Not Work" list, available publicly, that warns its members, and those of its sister unions, not to work or engage professionally with any person or entity that the union decides to include on the list. A-18 ¶3. The "Do Not Work" list is not optional or mere guidance that a member can ignore. AEA's own website states that members who do not comply will be disciplined or expelled. A-19 ¶9, A-136 ("You may face union discipline and risk losing your membership for any violation of this membership rule—which applies even if your membership is inactive.").

---

2.      *See* A-152 art. 2, §7; A-153 art. 3, §1(a); A-154 art. 3, §1(c); A-155 art. 3, §5(a); A-156 art. 3, §§7–8, §9(a); A-161 art. 7; A-161 art. 8, §§2–3; A-164-165 art. 2 § 4; A-165 art. 2 § 5; A-166 art. 2, §§10–11. Under Federal Rule of Evidence 201(c)(2), the Court may take judicial notice of Equity's Constitution and By-Laws. A149–82. AEA requested that the district court take notice of these materials in its motion to dismiss. MTD at 11 n.11.

The "Do Not Work" list was shared not just with AEA members, but with the members of the 4A unions as well, all of whom are also required to abide by the list's prohibition on working with Mr. Drabinsky as a producer. A-21 ¶14. Separately, throughout the complaint there are allegations detailing that AEA's allegedly defamatory statements against Mr. Drabinsky were published in some of the most widely read industry publications, including the *Broadway Briefing*, *Variety* and *Hollywood Reporter*. A-55 ¶136, A-68 ¶174, A-72–73 ¶190.

Beyond the reporting in industry publications, the defamatory statements resulted in negative press, including in the *New York Post*, and detrimental social media commentary against Mr. Drabinsky. A-54 ¶133. The wide dissemination in multiple media of the information that Mr. Drabinsky had been placed on this list, the risk to the careers and livelihoods of AEA and 4A members from not staying abreast of the list, and the acquiescence of union members to Mr. Drabinsky remaining on the list, when taken together and read in the light most favorable to Mr. Drabinsky are (or should) be sufficient to meet *Martin'*s requirements.

## C.  *Martin* Should No Longer Be Followed

The district court recognized the inherent injustice in *Martin* and acknowledged that it has been widely criticized because it "imposes an onerous and almost insurmountable burden on individuals seeking to impose liability on labor unions." A-95; *Modeste v. Loc. 1199, Drug, Hosp. & Health Care Emps. Union*, 850 F. Supp. 1156, 1168 (S.D.N.Y.), *aff'd*, 38 F.3d 626 (2d Cir. 1994). The rule ignores the characteristics of modern unions and serves only to deny justice.

The Court of Appeals adopted the rule in deference to the codification of the common law in General Association Law §13,[3] but questioned its suitability to the times even then. *Martin*, 101 N.E.2d at 686 ("So, for better or worse, wisely or otherwise, the Legislature has limited such suits . . . . [T]his court does not revise statutes, in an effort to eliminate seeming injustices, or to bring the law into accord with

---

3.  In relevant part, the statute provides "[a]n action or special proceeding may be maintained, against the president or treasurer of such an association, to recover any property, or upon any cause of action, for or upon which the plaintiff may maintain such an action or special proceeding, against all the associates, by reason of their interest or ownership, or claim of ownership therein, either jointly or in common, or their liability therefor, either jointly or severally." N.Y. Gen. Ass'ns Law § 13.

modern fact. Whatever reasons be pressed on us for such changes, the power to change is not ours. It is for the Legislature to decide . . . .”). The dissent criticized the disparity between allowing unions to sue for libel without requiring the unanimous authorization of their membership, but limiting suits against unions unless individual liability as to every single member could be alleged and proven. *Id*. at 693.

*Martin* has been denounced by courts ever since—both state and federal. *See, e.g., People v. Newspaper & Mail Deliverers' Union*, 683 N.Y.S. 2d 488, 493 (App. Div. 1998), *appeal denied*, 711 N.E.2d 653 (N.Y. 1999) (describing *Martin* as obsolete doctrine); *A. Terzi Prods. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 491 (S.D.N.Y. 1998) (noting that *Martin* rule is criticized often); *Cruz v. United Auto. Workers Union Loc. 2300*, No. 3:18-CV-0048 (GTS/ML), 2019 U.S. Dist. LEXIS 119662, at *45 (N.D.N.Y. July 18, 2019) (noting the rule has been rejected by federal courts and many other states).

Although the New York Court of Appeals reaffirmed *Martin* in *Palladino v. CNY Centro, Inc.*, 12 N.E.3d 436 (N.Y. 2014), the reaffirmance relies mostly on *stare decisis* while cataloging the criticisms against it and “question[ing] the continued utility or wisdom of the

*Martin* rule." *Id.* at 441. The court noted that "federal courts have abandoned the notion that labor unions have no liability independent of the liability of each of its members, and allows unions to sue and be sued for federal claims." *Id.* at 440 (citing *United Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 386–91 (1922)).

At the very least, the type of delegation exception adopted by the court in *Madden v. Atkins*, 151 N.E.2d 73 (N.Y. 1958) should apply here. In *Madden*, in a case of wrongful expulsion of a union member, a unanimous court reasoned that where an expulsion was "brought about by action on the part of the membership, at a meeting or otherwise, in accordance with the union constitution, the act of expulsion will be regarded as the act of the union for which damages may be recovered from union funds." *Id.* at 79.

The same reasoning should apply when the union members number in the tens of thousands, and the power to place an individual on the "Do Not Work" list rests with union committees to whom such power has been delegated by the Constitution and By-Laws, which contain no provisions that provide for or require prior authorization for these committees to

add a person to the list, nor any mechanism for any explicit ratification once this decision has been made.

## CONCLUSION

For all these reasons, this Court should vacate the district court's order of dismissal under Rule 12(b)(6) and remand for further proceedings.

Respectfully submitted,

Date:   June 30, 2023          BONA LAW PC

*/s/ Luke Hasskamp*
Luke Hasskamp

*Counsel for Appellant Garth Drabinsky*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,817 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word 2016, Century Schoolbook 14-point font.

Date:   June 30, 2023

BONA LAW PC

*/s/ Luke Hasskamp*
LUKE HASSKAMP

*Counsel for Appellant Garth Drabinsky*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:   June 30, 2023

BONA LAW PC

*/s/ Luke Hasskamp*
LUKE HASSKAMP

*Counsel for Appellant Garth Drabinsky*