# No. 23-795

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

GARTH DRABINSKY

*Plaintiff-Appellant,*

v.

ACTORS' EQUITY ASSOCIATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of New York
Case No. 1:22-CV-08933 (LGS)

## BRIEF FOR DEFENDANT-APPELLEE ACTORS' EQUITY ASSOCIATION

Evan Hudson-Plush
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, NY 10022-4869
(212) 356-0254

Jeffrey L. Kessler
David L. Greenspan
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-4698

*Attorneys for Defendant-Appellee Actors' Equity Association*

# TABLE OF CONTENTS

**Page**

INTRODUCTION................................................................1

JURISDICTIONAL STATEMENT ...........................................5

ISSUES PRESENTED FOR REVIEW .....................................5

STATEMENT OF THE CASE ...............................................6

    A.    The Parties ...........................................................6

    B.    Drabinsky Exercised Control Over the Actors and Stage Managers of *Paradise Square*.......................7

    C.    Drabinsky's Criminal Conviction ........................10

    D.    Paradise Square's CBA Breaches ........................11

    E.    Equity Places Drabinsky on the Do Not Work List..............12

    F.    Drabinsky Claims Wrongful Conduct by Equity.................14

    G.    The Proceedings Below .........................................15

SUMMARY OF ARGUMENT .................................................18

ARGUMENT .......................................................................21

I.    STANDARD OF REVIEW .............................................21

II.    THE STATUTORY LABOR EXEMPTION BARS DRABINSKY'S ANTITRUST CLAIMS .......................24

    A.    Courts Routinely Apply the Broad Statutory Labor Exemption to Dismiss Antitrust Claims .............................24

    B.    The Complaint Makes Clear That Equity Put Drabinsky on the Do Not Work List out of Legitimate Self-Interest.........................28

1.  Drabinsky's Allegation of a "Boycott" Concerning Working Conditions Is Squarely Within the Union's Legitimate Self-Interest ................................. 28

2.  Drabinsky's Arguments on Appeal are Unpersuasive ............................................. 34

C.  The Complaint Does Not Plausibly Allege that Equity Combined with a Non-Labor Group ..................................... 43

III.  PLAINTIFF'S STATE LAW CLAIMS ALSO FAIL ...................... 46

A.  *Martin v. Curran* Bars All of the State Law Claims ............ 46

1.  The Complaint Does Not Plausibly Allege that Each of Equity's 50,000 Members Authorized or Ratified the Alleged Misconduct ................................. 46

2.  *Martin* Defeats the Negligence Claim ......................... 51

(a)  *Martin* Applies to the Negligence Claim Because it Sounds in Intentional Conduct ......... 51

(b)  Appellant Forfeited His Argument Against Applying *Martin* to the Negligence Count ......... 53

B.  Drabinsky's Negligence Claim Should be Dismissed for Three Alternative Reasons ................................... 54

1.  The Negligence Claim is Subsumed by the Intentional Tort and Defamation Claims .................... 54

2.  Drabinsky Failed to Plead a Duty of Care ................. 56

3.  Federal Labor Law Preempts the Negligence Claim ................................. 57

CONCLUSION ............................................................... 59

CERTIFICATE OF COMPLIANCE ....................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. Terzi Prods., Inc. v. Theatrical Protective Union,*
    2 F. Supp. 2d 485 (S.D.N.Y. 1998) .................................................... 49

*Alfaro v. Wal-Mart Stores, Inc.,*
    210 F.3d 111 (2d Cir. 2000) ............................................................. 56

*Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n,*
    640 F.2d 1368 (1st Cir. 1981) .................................................. 28, 42, 43

*Am. Fed. of Musicians v. Carroll,*
    391 U.S. 99 (1968).................................................................... 42, 45

*AMA v. United States,*
    317 U.S. 519 (1942)........................................................................ 43

*Apex Hosiery Co. v. Leader,*
    310 U.S. 469 (1940)........................................................................ 29

*ASARCO LLC v. Goodwin,*
    756 F.3d 191 (2d Cir. 2014) ............................................................. 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................. 21, 22, 23

*Associated Gen. Contractors of California, Inc. v.*
    *California State Council of Carpenters,*
    459 U.S. 519 (1983)........................................................................ 26

*Balintulo v. Ford Moto Co.,*
    796 F.3d 160 (2d Cir. 2015) ............................................................. 40

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................*passim*

*Bldg. Indus. Fund v. Local Union No. 3,*
    992 F. Supp. 192 (E.D.N.Y. 1996) .................................................... 48

iii

*Brown v. Pro Football, Inc.*,
    518 U.S. 231 (1996) ........................................................ 26

*Browning-Ferris Indus. of Cal., Inc. v. N.L.R.B.*,
    911 F.3d 1195 (D.C. Cir. 2018) ...................................... 38

*Butcher v. Wendt*,
    975 F.3d 236 (2d Cir. 2020) ........................................... 45

*Checker Taxi Co. v. Nat'l Prod. Workers Union*,
    113 F.R.D. 561 (N.D. Ill. 1986) ...................................... 30

*Clarett v. Nat'l Football League*,
    369 F.3d 124 (2d Cir. 2004) ........................................... 29

*Colfax Corp. v. Ill. State Toll Highway Auth.*,
    No. 93-CV-7463, 1994 WL 444882 (N.D. Ill. Aug. 16, 1994) ............. 27

*Confederacion Hipica de Puerto Rico, Inc. v.*
    *Confederacion de Jinetes Puertorriquenos, Inc.*,
    30 F.4th 306 (1st Cir. 2022) ........................................... 42

*Corns v. Laborers Int'l Union*,
    709 F.3d 901 (9th Cir. 2013) ........................................... 23

*Darby v. Greenman*,
    14 F.4th 124 (2d Cir. 2021) ........................................... 44

*Dickey v. Nat'l Football League*,
    No. 17-CV-12295-IT
    2018 WL 4623061 (D. Mass. Sept. 26, 2018) ............. 27

*Doe v. Trump Corp.*,
    6 F.4th 400 (2d Cir. 2021) ............................................. 53

*Duane Reade Inc v. Local 338 Retail,*
    *Wholesale, Dep't Store Union*,
    791 N.Y.S.2d 288 (N.Y. Sup. Ct. 2004) ................. 50, 54

*E.E.O.C. v. Port Auth. of N.Y. & N.J.*,
    768 F.3d 247 (2d Cir. 2014) ........................................... 23

*Elliott v. Amalgamated Meat Cutters*
  *& Butcher Workmen of N. Am.,*
  91 F. Supp. 690 (W.D. Mo. 1950) ........................................ 32

*Espinal v. Melville Snow Contractors, Inc.,*
  98 N.Y.2d 136 (2002) ............................................................ 57

*Fernandez v. Fernandez,*
  189 N.Y.S.3d 538 (2d Dep't 2023) .................................... 55

*Francis v. Kings Park Manor, Inc.,*
  992 F.3d 67 (2d Cir. 2021) .................................................. 40

*Freeman v. HSBC Holdings PLC,*
  57 F.4th 66 (2d Cir. 2023) .................................................. 21

*Glacier Nw., Inc. v. Int'l Bhd. of*
  *Teamsters Loc. Union No. 174,*
  143 S. Ct. 1404 (2023) .......................................................... 57

*Global Reinsurance Corp. of Am. v. Century Indem. Co.,*
  22 F.4th 83 (2d Cir. 2021) ............................................ 47, 54

*Goldman v. Barrett,*
  733 F. App'x 568 (2d Cir. 2018) ...................................... 56

*H. A. Artists & Assocs. v. Actors' Equity Ass'n,*
  451 U.S. 704 (1981) ...................................................... *passim*

*HBO v. Directors' Guild of Am,*
  531 F. Supp. 578 (S.D.N.Y. 1982) .............................. 33, 58

*Healthcare Ass'n of N.Y.S., Inc. v. Pataki,*
  471 F.3d 87 (2d Cir. 2006) .................................................. 57

*Hengjun Chao v. Mount Sinai Hosp.,*
  476 F. App'x 892 (2d Cir. 2012) ...................................... 56

*Hirsch v. Arthur Andersen & Co.,*
  72 F.3d 1085 (2d Cir. 1995) .............................................. 23

*Hunt v. Crumboch,*
     325 U.S. 821 (1945) ...................................................*passim*

*Hurley v. Nat'l Basketball Players Ass'n,*
     No. 22-3038, 2022 WL 17998878 (6th Cir. Dec. 30, 2022) ..... 26, 27, 36

*Intercontinental Container Transp. Corp. v.*
*New York Shipping Ass'n,*
     426 F.2d 884 (2d Cir. 1970) .......................................*passim*

*Jacksonville Bulk Terminals, Inc. v.*
*International Longshoremen's Ass'n,*
     457 U.S. 702 (1982)................................................ 26, 41, 42

*Jou-Jou Designs v. Int'l Ladies Garment Workers Union,*
     643 F.2d 905 (2d Cir. 1981) ......................................... 25, 27

*Kavowras v. New York Times Co.,*
     328 F.3d 50 (2d Cir. 2003) ................................................ 22

*Kesner v. Dow Jones & Co.,*
     515 F. Supp. 3d 149 (S.D.N.Y. 2021) ...................................55

*King v. City of New York,*
     No. 22-231, 2023 WL 2398679 (2d Cir. Mar. 8, 2023).......................36

*Kreutzer v. East Islip Union Free School Dist.,*
     2015 WL 9254522 (N.Y. Sup. Ct. Dec. 2, 2015)............................53

*Lekettey v. City of New York,*
     637 F. App'x 659 (2d Cir. 2016) .........................................37

*LK Prods., Inc. v. Am. Fed'n of Television & Radio Artists,*
     475 F. Supp. 251 (S.D. Tex. 1979) ......................................33

*Mandala v. NTT Data, Inc.,*
     975 F.3d 202 (2d Cir. 2020) ............................................22

*Martin v. Curran,*
     303 N.Y. 276 (1951) .................................................. *passim*

*Mayor & City Council of Baltimore, Md. v.*
    *Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ............................................................... 35

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016) ......................................................... 53, 54

*Mid-Am. Regional Bargaining Ass'n v.*
    *Will Cnty. Carpenters Dist. Council*,
    675 F.2d 881 (7th Cir. 1982) ................................................. 26, 27, 45

*Modeste v. Local 1199*,
    850 F. Supp. 1156 (S.D.N.Y. 1994) ................................................ 47

*Moleon v. Alston*,
    No. 21-CV-1398 (PAE)
    2021 WL 5772439 (S.D.N.Y. Dec. 3, 2021) ...................................... 48

*Morrissey v. Nat'l Mar. Union of Am.*,
    544 F.2d 19 (2d Cir. 1976) ........................................................... 47, 54

*Morrow v. MetLife Invs. Ins.*,
    113 N.Y.S.3d 421 (4th Dep't 2019) .................................................. 55

*N.L.R.B. v. Red Top, Inc.*,
    455 F.2d 721 (8th Cir. 1972) ............................................................ 43

*N.Y.S. Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
    798 F.3d 125 (2d Cir. 2015) ............................................................. 53

*NECA-IBEW Health & Welfare Fund v.*
    *Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) ............................................................. 23

*Olney v. Town of Barrington*,
    118 N.Y.S.3d 898 (4th Dep't 2020) .................................................. 55

*Palladino v. CNY Centro*,
    23 N.Y.3d 140 (2014) ......................................................... 46, 51, 54

*Performing Arts Ctr. of Suffolk Cnty. v.*
*Actors' Equity Ass'n*, No. 20-CV-2531 (JS) (AYS)
2022 WL 16755284 (E.D.N.Y. Aug. 25, 2022) .................................. 47

*Pusey v. Bank of Am., N.A.*,
No. 14-CV-04979 (FB) (LB)
2015 WL 4257251 (E.D.N.Y. July 14, 2015).................................. 55

*Rates Tech. Inc. v. Speakeasy, Inc.*,
685 F.3d 163 (2d Cir. 2012) .............................................. 10

*Republic Prods., Inc. v. Am. Fed'n of Musicians*,
245 F. Supp. 475 (S.D.N.Y. 1965)........................................ 28, 30, 41

*Roman Restoration, Inc. v. Operative Plasterers'*
*& Cement Masons' Int'l Ass'n, Local No. 8*,
No. 07-CV-2991 (RBK)
2008 WL 2684350 (D.N.J. June 30, 2008)........................................ 27

*Salemeh v. Toussaint ex rel. Local 100*
*Transp. Workers Union*,
810 N.Y.S.2d 1 (1st Dep't 2006)........................................ 52

*San Diego Bldg. Trades Council v. Garmon*,
359 U.S. 236 (1959)........................................ 57

*Schwartz v. Cap. Liquidators, Inc.*,
984 F.2d 53 (2d Cir. 1993) .............................................. 10

*Sudler v. City of New York*,
689 F.3d 159 (2d Cir. 2012) .............................................. 24

*Sullivan v. N. Babylon Union Free Sch. Dist.*,
No. 15-CV-0834 (JS) (SIL)
2016 WL 11673810 (E.D.N.Y. Mar. 21, 2016) .................................. 51

*Tuvia Convalescent Center, Inc. v. National*
*Union of Hosp. & Health Care Emps.*,
553 F. Supp. 303 (S.D.N.Y. 1982)........................................ 27

*United Bhd. Of Carpenters & Joiners of Am. v. Sperry*,
  170 F.2d 863 (10th Cir. 1948) ............................................. 32

*United Nat. Ins. Co. v. Tunnel, Inc.*,
  988 F.2d 351 (2d Cir. 1993) ......................................... 54, 55

*United States v. Delva*,
  858 F.3d 135 (2d Cir. 2017) ............................................. 24

*United States v. Hutcheson*,
  312 U.S. 219 (1941) .................................................... *passim*

*USS-POSCO Indus. v. Contra Costa Cty.*
  *Bldg. & Constr. Trades Council*,
  31 F.3d 800 (9th Cir. 1994) ......................................... *passim*

*Warnick v. Washington Educ. Ass'n*,
  593 F. Supp. 66 (E.D. Wash. 1984) ................................. 27

*Whitehurst v. 1199 SEIU United Healthcare Workers E.*,
  928 F.3d 201 (2d Cir. 2019) ............................................. 59

*Whiteside v. Hover-Davis, Inc.*,
  995 F.3d 315 (2d Cir. 2021) ............................................. 22

*Yamashita v. Scholastic, Inc.*,
  936 F.3d 98 (2d Cir. 2019) ......................................... 22, 45

*Ziming Shen v. City of New York*,
  725 F. App'x 7 (2d Cir. 2018) ......................................... 55

**Administrative Decisions**

*Grauman Co.*,
  87 NLRB 755 (1949) ...................................................... 32

*Millwright & Mach. Erectors*,
  287 NLRB 545 (1987) .................................................... 58

*Steven Stripling*,
  316 NLRB 710 (1995) .................................................... 58

**Statutes**

28 U.S.C. § 1291 ................................................................5

28 U.S.C. § 1331 ................................................................5

29 U.S.C. § 52 ........................................... 19, 25, 29, 33

29 U.S.C. § 101 ................................................... 2, 25

29 U.S.C. § 104 ...................................... 19, 29, 33, 38

29 U.S.C. § 113 ....................................................... 2, 38

29 U.S.C. § 152 ............................................................. 38

29 U.S.C. § 158 ............................................................. 58

## INTRODUCTION

Appellee-Defendant Actors' Equity Association ("Equity" or the "Union") is a labor union that represents approximately 50,000 actors and stage managers who perform in the live theater industry, including on Broadway. Appellant-Plaintiff Garth Drabinsky served as the "lead creative producer" of *Paradise Square*, a Broadway musical.

This case involves a classic labor dispute. *Paradise Square* repeatedly breached its obligations under the collective bargaining agreement with Equity by failing to pay wages and health and retirement benefit contributions owed to the actors and stage managers. Equity initiated multiple grievances, arbitrations, and lawsuits to collect the monies owed under the collective bargaining agreement. The *Paradise Square* cast then asked Equity to place Drabinsky on its Do Not Work List to protect their wages and working conditions—a fact Drabinsky incorporated into the Complaint by attaching the cast's July 14, 2022 letter. A-72 (¶189), A-126 (Ex. 39A). Equity addressed its members' concerns and did so.

In his lawsuit, Drabinsky asserts two antitrust (Sherman Act) claims and three state-law claims (defamation, intentional tort,

and negligence) against Equity. All are grounded in the labor dispute involving *Paradise Square*.[1] The District Court dismissed all five counts with prejudice, based on Drabinsky's own factual averments. Specifically, the court found that Drabinsky's allegations confirmed his antitrust claims were precluded by Equity's "statutory labor exemption" as a matter of law. And, with respect to Appellant's state-law claims, the court found that those claims were precluded under well-settled New York law protecting unincorporated associations like Equity from liability absent *every* member's ratification of the alleged misconduct—facts that Appellant did not and could not allege.

Congress created the statutory labor exemption by enacting the Clayton Act, 15 U.S.C. § 17, and the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.* The exemption was intended to stop courts from interfering with traditional union activity and to protect unions from most antitrust claims. *H. A. Artists & Assocs. v. Actors' Equity Ass'n*,

---

[1] The Norris-LaGuardia Act broadly defines a "labor dispute" to include "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c).

451 U.S. 704, 714 (1981).  Under the exemption, as long as a union acts in its legitimate self-interest, and not in combination with a non-labor group, its labor activities are immune from antitrust review. Importantly, when the statutory exemption applies, "the wisdom or unwisdom, the rightness or wrongness" of union decision-making is beyond the judiciary's province.  *United States v. Hutcheson*, 312 U.S. 219, 232 (1941) (Frankurter, J).

As the court below concluded, it is plain on the face of the Complaint that Drabinsky cannot overcome Equity's statutory labor exemption.  The Do Not Work List—like a strike—is prototypical union activity because it embodies union members' Congressionally-protected right to withhold their labor.  And, as the *Paradise Square* cast's July 2022 letter demonstrates, Equity put Drabinsky on the List for the "traditional union end" of protecting members' wages and working conditions.  The Complaint also does not plausibly allege that Equity combined with a non-labor group.  Dismissal of the antitrust claims was thus required by Drabinsky's allegations.

On appeal, Drabinsky advances conclusory arguments that Equity's motives were about something other than wages and working

conditions.  But his allegations are speculative and implausible under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  They are also legally irrelevant.  Even *if* Equity's motive were rooted in antagonism against Drabinsky, his antitrust claims would *still* have to be dismissed under controlling Supreme Court precedent holding that a union is free to direct its members to "sell or not sell their labor as they please, and upon such terms and conditions as they choose, without infringing the [antitrust] laws" even when motivated by "personal antagonism."  *Hunt v. Crumboch*, 325 U.S. 821, 824-25 (1945).

As for Drabinsky's state law claims, they are barred under *Martin v. Curran*, 303 N.Y. 276 (1951).  *Martin* has been the law of New York for decades—recently reaffirmed by the Court of Appeals—and required Drabinsky to plead that each of Equity's 50,000 members authorized or ratified its allegedly wrongful conduct.  Drabinsky's assertion that *Martin* is "widely criticized" tacitly concedes that his Complaint does not satisfy its mandates.  And Drabinsky's claim, raised for the first time on appeal, that *Martin* is inapplicable to his negligence claim is incorrect:  Drabinsky's negligence claim, like his other state-law claims, rests on allegations of intentional wrongdoing, triggering

*Martin*.  In any event, Drabinsky's negligence claim is also barred because it is subsumed by the intentional tort and defamation claims, fails to allege a cognizable duty of care, and is preempted by two federal labor laws.

For all of these reasons, this Court should affirm.

## JURISDICTIONAL STATEMENT

Equity does not dispute this Court's jurisdiction.  The District Court had jurisdiction under 28 U.S.C. § 1331, and, since the entry of a final judgment on April 14, 2023, this Court has jurisdiction under 28 U.S.C. § 1291.  *See* A-104.

## ISSUES PRESENTED FOR REVIEW

Whether the District Court properly dismissed Drabinsky's antitrust claims under the statutory labor exemption because the allegations in the Complaint establish that Equity placing Drabinsky on the Do Not Work List was in the Union's legitimate self-interest and not in combination with a non-labor group?

Whether the District Court properly dismissed Drabinsky's state claims under settled New York law or, alternatively, that the judgment should be affirmed on the ground that the claims are preempted by federal labor law?

## STATEMENT OF THE CASE

### A.  The Parties

Equity is a national labor union that represents more than 50,000 actors and stage managers who perform in the live theater industry.  A-17 (¶2).  Between the Fall of 2021 and the Summer of 2022, Paradise Square Broadway Limited Partnership (the "Broadway Partnership") and Paradise Square Production Services, Inc. (together, the "Production") produced a live theatrical show entitled *Paradise Square* in Chicago and New York, respectively.  *See* A-36 (¶55), 49 (¶106), 50 (¶112), 71 (¶187).  The terms and conditions for actors and stage managers in both Chicago and New York were set forth in a collective bargaining agreement ("CBA") between Equity and the Broadway League, a multi-employer bargaining association.  A-11 (p.2), 20 (¶10); *see also* A-183 (Ex. 13) (attaching the CBA).

Garth Drabinsky was the "lead creative producer" for the Chicago and Broadway productions of *Paradise Square*.  A-36 (¶56); A-35 (¶54) ("Drabinsky chose to develop and produce *Paradise Square*").  Although, likely due to a prior criminal conviction discussed *infra* at pp. 10-11, Drabinsky could not serve as the technical "employer of record" for the CBA, *see* A-36 (¶56), his allegations make clear that he

controlled most if not all aspects of the Production. A-35 (¶54), 38-39 (¶¶65-68), 43 (¶¶81-82), 45-46 (¶¶90-91, 96), 51-52 (¶¶118, 123), 57 (¶145), 61 (¶161), 68-69 (¶¶, 176, 178-80), 74-75 (¶¶193, 196).

### B. Drabinsky Exercised Control Over the Actors and Stage Managers of *Paradise Square*

The Complaint's opening statement alleges that, on the Broadway production, "Drabinsky took" "extensive measures" to "improve the financial and working conditions of members of the cast and stage management of *Paradise Square*" and "caused" the Production to "vary the minimum terms" of Equity's CBA. A-11 (p.2). Among other things, Drabinsky "provided the cast with opportunities to earn incremental fees" by recording a cast album, "acquiesced" to the cast's request to perform at the Tony Awards, costing "nearly $200,000," and "successfully urged" the Production to amend the financial terms of the cast's individual employment contracts. A-12 (p.3). He also directed rehearsal schedules, A-51 (¶118), 68-69 (¶¶176, 179) (Drabinsky "unilaterally decided" to extend the rehearsal schedule for the "safety of the Cast"), a key term of actors' and stage managers' employment; managed and approved the cast's overtime requests, A-69 (¶178) ("Drabinsky instructed" the general manager to incur "as little

7

overtime . . . as possible"), (¶180) (Drabinsky "approved" requests for overtime); hired a new hair supervisor, A-61 (¶164); "acquiesced" to the holding of an opening night party, A-57 (¶145); and intervened when he believed that an actor had breached her contract, A-61 (¶¶160-61).

Drabinsky alleges facts showing his control over the Chicago production too. In addition to "assembl[ing]" the 36-member cast, A-39 (¶67), Drabinsky "direct[ed]" the Production to engage a consulting firm to investigate sexual harassment allegations and otherwise purported to oversee the cast's safety. A-39 (¶68), 44 (¶¶90-91); *see also* A-12 (¶iv) ("Drabinsky spent significant time intervening in [employment] issues and conflicts that affected the Cast" and "acted to protect the health [and] safety" of the cast). He also decided "on behalf of" the Broadway Partnership which cast members from an earlier production in Berkeley, California would be employed in Chicago, A-46 (¶96); *see also* A-48 (¶103) (additional cast hiring at his "urging"); "commence[d]" negotiations with the Nederlander family" to secure a venue for the show, A-38 (¶65); and "successfully urged" the Production to provide the cast with interest-free loans. A-43 (¶81); *id.* (¶82) (stating that

numerous cast members "took advantage of *Drabinsky['s]*" generosity) (emphasis added).

Drabinsky alleges that he is a "producer who seeks to engage" Broadway actors and stage managers and competes with producers "of productions that employ actors and stage managers." A-83 (¶¶233-34); *cf.* A-26 (¶27) (at "one point," Drabinsky "*employed*" more than 250 Black Equity members) (emphasis added). He further alleges that "[a]ll producers" of Broadway productions must "engage members of [Equity] in their productions," and these "Broadway producers . . . , *including Drabinsky*," cannot mount their shows without Equity members. A-81 (¶226) (emphasis added); *see* A-86 (¶243) ("Producers, like Drabinsky, have no reasonable alternative other than to *hire*" Equity members on Broadway) (emphasis added). He also claims that part of his alleged "innovativeness" is that *he* "created a vertically integrated company that controlled and managed all aspects of every Drabinsky-produced" production, and *he* "restructur[ed] compensation packages" for the benefit of Equity members. A-28 (¶32), A-75 (¶196).

All of this conduct—as averred by Drabinsky in his Complaint—leaves no ambiguity about his ability to influence the wages and working conditions of the *Paradise Square* cast.

## C.    Drabinsky's Criminal Conviction

On January 14, 1999, the United States Attorney's Office for the Southern District of New York indicted Drabinsky.  A-30 (¶38); *see United States v. Drabinsky*, No. 99-CR-17 (S.D.N.Y.).[2]  The indictment charged Drabinsky with sixteen counts, including falsifying records and lying to auditors, arising from an accounting fraud scheme involving Livent, Inc., a theatrical entertainment company that produced Broadway shows and for which Drabinsky was the CEO.  *See* Docket No. 5 ¶¶2, 3 in 99 Cr. 17.

On July 31, 2006, Canadian authorities charged Drabinsky with crimes arising out of the same underlying fraudulent scheme.  *Id.* ¶3.  On March 25, 2009, after trial, a Canadian court found Drabinsky guilty and later sentenced him to seven years' imprisonment, which was

---

[2] This Court may take judicial notice of the court records involving Plaintiff's indictment and conviction.  *See Rates Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 166 & n.3 (2d Cir. 2012); *Schwartz v. Cap. Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993).

reduced to five years on appeal. *Id.* ¶¶4-5; A-32 (¶¶43-44). In light of the conviction and service of time for the same underlying conduct, the United States charges were later dismissed. Docket No. 5 ¶7 in 99 Cr. 17.

On June 15, 2017, in part because he "was responsible for one of the most significant Canadian financial frauds in recent decades," the Ontario Securities Commission permanently banned Drabinsky "from acting in a position of trust and authority for entities that may participate in the capital markets," including acting as an officer or director. The Commission specifically rejected Drabinsky's proposed "carve-out[]" for a "Creative Services Exception" that would have permitted him a broader role because "Drabinsky could, in reality, take all the restricted financial actions and then have them rubber-stamped by others." *In re Drabinsky*, 2017 ONSEC 22 (CanLII) (June 15, 2017), ¶¶50, 61-62, 73, 75, *available at* https://canlii.ca/t/h4wz7.

D.    **Paradise Square's CBA Breaches**

In the months leading up to Plaintiff's placement on the Do Not Work List (*see infra* pp. 12-14), *Paradise Square* failed to pay the cast, the health and retirement funds, and Equity nearly $500,000 that

the Production owed under the CBA (including the actors' and stage managers' required health, pension, and 401(k) contributions). After Equity initiated an arbitration to collect $224,900, and after the Production admitted that it violated the CBA, the arbitrator ruled in Equity's favor. *See* A-109, 111 (¶¶1-2) (May 2022 arbitration award and settlement agreement). Full payment was not made until June 3, 2022, *see* A-111 (¶3), months after the benefits and payments were due.

The Production's failure to pay the actors and stage managers persisted. On July 29th, 2022, an arbitrator concluded that the Production further violated the CBA and awarded Equity $242,708. A-143–48. Among other things, the Production failed to (i) compensate the actors and stage managers for their work in creating the cast album, (ii) make additional health and 401(k) contributions, and (iii) remit union dues to Equity after deducting them from the actors' and stage managers' checks. A-145, 147.

E. **Equity Places Drabinsky on the Do Not Work List**

Equity maintains an internal membership rule that precludes its members from working as an actor or stage manager for non-union or defaulting employers. A-19 (¶9); A-136 (Ex. 40). The "Do

Not Work List" alerts Equity's members to the non-union or defaulting status of these employers. A-136. Equity and the other four performer unions in the entertainment industry—collectively known as the "Associated Actors and Artists of America," or the "4A's," A-21 (¶14)—have a policy of respecting each other's do-not-work lists.

On July 14, 2022, the cast of *Paradise Square* asked Equity to place *Drabinsky* on the Do Not Work List. A-72 (¶189) (referring to and quoting letter), 126 (article attached to the Complaint as Exhibit 39A and quoting the cast's letter in full). The cast wrote that Drabinsky made "all executive decisions surrounding the production" and "created an unsafe, toxic, and frequently hostile work environment." A-126. As a result, "due to outstanding payments and benefits, and a continued pattern of abuse and neglect," the cast "call[ed] for" Drabinsky "to be placed" on the List. *Id.*

Responding to its members' concerns, and because the Union concluded that Drabinsky had "made it clear that he [was] unable to uphold the terms of a union contract," A-123 (Ex. 39A), Equity subsequently placed Drabinsky on the Do Not Work List. A-72 (¶190), 136 (Ex. 40); *see* A-122 (Ex. 39A) ("Actors' Equity said it plans to put

producer Garth Drabinsky on the 'Do Not Work' List *after Paradise Square* castmembers [sic] sent a letter speaking out against him.") (emphasis added); A-123 (Ex. 39A) (Equity "intends to add" Drabinsky to List "immediately after[]" the show closes "on July 17").

### F.    Drabinsky Claims Wrongful Conduct by Equity

Drabinsky alleges that Equity engaged in a "pattern of conduct to maliciously defame and harm [him]." A-17 (p.8). In support of this allegation, he points primarily to an October 25, 2021 grievance that Equity filed regarding the Chicago production of *Paradise Square*, A-41 (¶76), 107 (Ex. 9), which stated that Drabinsky used "inappropriate and unwanted racial slurs during rehearsals" and created a "hostile work environment." *Id.*

Drabinsky also alleges that Equity breached the CBA and allowed its members to do the same and/or make other defamatory comments. In this regard, Drabinsky claims that Equity violated Rule 43 of the CBA when it allegedly refused to pursue allegations that a cast member had engaged in sexual harassment. A-43–45 (p.34, ¶¶85, 90); *see also* A-51–54 (¶¶120, 125, 132) (alleging Equity violated Rules 25 and 42 when it purportedly instructed the cast not to attend

rehearsal).  Drabinsky similarly alleges that, by submitting the hostile work environment grievance, Equity provided an "escape hatch" for the cast to breach their individual employment agreements and "contaminated" the show's atmosphere.  A-62 (¶¶165-66).

### G.  **The Proceedings Below**

Drabinsky filed his original complaint—with no antitrust claims—on October 20, 2022.  Docket No. 1.[3]  After Equity filed a pre-motion letter indicating its intent to file a motion to dismiss, *see* Docket No. 7, Drabinsky filed the First Amended Complaint ("FAC" or "Complaint"), adding the two antitrust claims under Sections 1 (conspiracy) and 2 (monopolization) of the Sherman Act.  A-10.  Equity again filed a pre-motion letter, *see* Docket No. 23, and then moved to dismiss the FAC, Docket No. 38.

In its motion, Equity argued that Drabinsky's allegations established that Equity's placement of Drabinsky on the Do Not Work List was immune from antitrust review under both the statutory and non-statutory labor exemptions to the antitrust laws.  *See* Docket No.

_____

[3] All references to "Docket No." are to the Docket number in the District Court unless otherwise indicated.

39.  Equity also asserted that Drabinsky failed to plead antitrust injury because the alleged group boycott asserted harm to Drabinsky alone— not harm to competition as the Second Circuit requires.  *Id.*

As for the state-law claims, Equity argued that: (1) all three claims were barred by *Martin v. Curran* and preempted by both the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185; (2) the negligence and intentional tort claims were duplicative of the defamation claim; and (3) the negligence count failed to state a claim. *Id.*

On April 14, 2023, the District Court (Schofield, J.) granted the motion to dismiss with prejudice, explaining that the "facts are taken from the FAC and assumed to be true for purposes of this motion."  SA-1.  Based on the allegations in the FAC, the District Court determined that the antitrust claims were barred by the statutory labor exemption.  Specifically, the Court explained that "[b]ased on the allegations in the FAC," Equity placed Drabinsky on the Do Not Work List "in response to a letter from the *Paradise Square* cast" reporting a "hostile and unsafe work environment and unpaid wages and benefits,"

which the cast attributed to Drabinsky.  SA-8.  Thus, as the District

Court found, Drabinsky's allegations showed that Equity "acted in its

self-interest" and did so without combining with non-labor entities.  *Id.*;

*see also* SA-13–14.  Because the statutory exemption applied, it became

"unnecessary to decide" whether the non-statutory exemption

additionally applied, or whether Drabinsky had adequately pleaded

antitrust injury.  SA-14.

      As for the state-law claims, the Court held that they were

barred by the New York Court of Appeal's decision in *Martin*, which

requires plaintiffs alleging torts against unincorporated associations

(like Equity) to plead facts showing "the individual liability of every

single member."  SA-5.  Drabinsky did not—and could not—plausibly

allege that each of Equity's 50,000 members had knowledge of and

authorized or ratified the allegedly wrongful conduct.  SA-6–7.  Because

*Martin* was dispositive, the Court did not consider whether the New

York claims also were preempted by federal labor law, SA-8, or whether

they otherwise state plausible claims.

1.     The District Court properly granted Equity's motion to dismiss.  Drabinsky affirmatively pled facts showing that his placement on the Do Not Work List was in Equity's legitimate self-interest and not the product of an agreement with any non-labor party.  It is thus clear, on the face of the Complaint, that the statutory labor exemption applies and requires dismissal of the antitrust claims.  *H. A. Artists*, 451 U.S. at 714; *Hutcheson*, 312 U.S. at 232.

2.     A union's conduct is in its legitimate self-interest when the union acts to serve the interests of its members.  *Intercontinental Container Transp. Corp. v. New York Shipping Ass'n*, 426 F.2d 884, 887 & n.2 (2d Cir. 1970).  Courts can make this inquiry by assessing whether the conduct at issue is a "traditional union activity," related to "traditional union ends."  *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 808-09 (9th Cir. 1994).  Here, on the face of the Complaint, Equity's conduct easily clears this modest hurdle.  As Drabinsky alleges, Equity acted in response to its members' stated concerns about wages and working conditions.  And

Equity did so by employing a do-not-work list, which, like a strike, is quintessential union activity.  29 U.S.C. §§ 52, 104(a), (g).

3.     Drabinsky's conclusory allegations that Equity had some *other*, unidentified, and illegitimate interest in placing him on the Do Not Work List must be rejected.  Naked allegations of illicit "intent" fail under *Twombly* and its progeny.  But even assuming, *arguendo*, that Equity (implausibly) placed Drabinsky on the List due to some personal animus, his antitrust claims would still fail.  Under the statutory labor exemption, courts cannot second-guess "the wisdom or unwisdom, the rightness or wrongness" of union decision-making involving a labor dispute, *Hutcheson*, 312 U.S. at 232, *even if* motivated by antagonism. *Hunt*, 325 U.S. at 824-25 (unions are free to "sell or not sell their labor as they please . . . without infringing the [antitrust] laws" even when the result of "personal antagonism").

4.     Drabinsky has also not pled any facts to plausibly show that any non-labor parties were involved in Equity's decision to place Drabinsky on the Do Not Work List.  While he argues on appeal that some Equity members have roles as both actors and producers, Drabinsky does not allege ***any*** facts that any of ***these*** Union members

conspired with Equity to place Drabinsky on the List.  Notably,

Drabinsky's "allegations" on appeal about "Bette Middler, Whoopi

Goldberg and Cher" not only are absent from his Complaint, they are

bereft of any explanation about what these putative actor-producers

have to do with *Paradise Square*, Drabinsky, or his placement on the Do

Not Work List.

       5.     The District Court also correctly dismissed Drabinsky's

state-law claims under *Martin*.  New York law required Drabinsky to

allege that *each* of Equity's 50,000 members authorized or ratified the

allegedly wrongful conduct before the Union—an unincorporated

association—could be held liable.  Appellant does not seriously contend

that his Complaint allegations satisfy this requirement, instead arguing

that *Martin* is "widely criticized."  But this Court is required to follow

New York law as it stands—without regard to whether the law is

criticized or celebrated.  And the mere fact that the List is publicly

available does not satisfy *Martin*'s requirement that every Union

member have "full knowledge" of, and authorize or ratify, the "specific

[allegedly unlawful] acts in question," *Martin*, 303 N.Y. at 282.

6. *Martin* applies to all of the state law claims because the negligence claim, like the intentional tort and defamation claims, is based on the same allegedly wrongful and *intentional* conduct: Equity's placement of Drabinsky on the Do Not Work List and grievances against the Production based on Drabinsky's behavior.

7. Drabinsky has also forfeited the argument that *Martin* does not apply to his negligence claim by not raising this contention below in the District Court.

8. Alternatively, this Court can independently affirm dismissal of the negligence claim because it is subsumed by and duplicative of the defamation and intentional tort claims, fails to allege a cognizable duty of care, and/or is preempted by two federal labor laws.

## ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal of a complaint under Rule 12(b)(6). *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 74 (2d Cir. 2023). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff's claims must be more than

just "conceivable" or "speculative." *Twombly*, 550 U.S. at 555, 570. As a result, courts do not credit "naked assertions devoid of further factual enhancement," *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. Courts also do not accept as true allegations that amount to mere legal conclusions, including those concerning a defendant's state of mind. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021). A complaint must be dismissed where the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Yamashita v. Scholastic, Inc.*, 936 F.3d 98, 104 (2d Cir. 2019) (*per curium*).

In considering a motion to dismiss under Rule 12(b)(6), a court may consider, in addition to the facts alleged in the complaint, "any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014). The court may also consider facts that are properly subject to judicial notice, *see Kavowras v. New*

*York Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003), including court records

and related arbitration cases. *Supra* p. 10 n.2 (citing cases); *Corns v.*

*Laborers Int'l Union*, 709 F.3d 901, 904 n.1 (9th Cir. 2013); Appeal

Docket No. 39 ("Pl. Br.") at 10 n.1 & 46 n.2.

Courts also do not assume that factual allegations are true

when they are "contradicted by more specific allegations" in the

complaint or "documentary evidence" attached thereto. *NECA-IBEW*

*Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 n.1

(2d Cir. 2012); *see Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095

(2d Cir. 1995) (affirming dismissal where the complaint's "attenuated

allegations" were "contradicted both by more specific allegations in the

complaint" and "facts of which we may take judicial notice").

Appellant argues for a standard of review that contradicts

these precedents. Drabinsky's proposed standard—that a complaint

should not be dismissed unless it "appears beyond doubt" that the

plaintiff can prove "no set of facts" to support his claim, Pl. Br. at 20—

was "abandoned by the [Supreme] Court's . . . rulings in *Twombly* and

*Iqbal*." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir.

2014). Further, although Drabinsky quotes *Twombly* as saying

dismissal prior to discovery in antitrust cases should be "granted very sparingly," Pl. Br. at 20, this quote was rejected by the majority and comes from Justice Stevens' *dissent*.  550 U.S. at 587; *see also id.* at 558 (explaining that "antitrust discovery" in particular is "expensive" and "unusually high").

Finally, a court may affirm judgment "on any ground which finds support in the record," *Sudler v. City of New York*, 689 F.3d 159, 178 (2d Cir. 2012), including arguments made in a motion to dismiss that were not relied upon by the District Court.  *See United States v. Delva*, 858 F.3d 135, 152 (2d Cir. 2017).

## II.     THE STATUTORY LABOR EXEMPTION BARS DRABINSKY'S ANTITRUST CLAIMS

Accepting the factual allegations in the Complaint as true, Drabinsky cannot overcome the statutory labor exemption which requires dismissal of his antitrust claims.

### A.     Courts Routinely Apply the Broad Statutory Labor Exemption to Dismiss Antitrust Claims

Federal labor and antitrust law inherently conflict.  *H.A. Artists*, 451 U.S. at 713.  After passage of the Sherman Act in 1890, courts "enjoined strikes as unlawful restraints of trade" when a union's objectives were, according to the courts, socially or economically

harmful. *Id.* Congress disagreed. It responded by broadly protecting union activity from antitrust scrutiny by adopting Sections 6 and 20 of the Clayton Act (15 U.S.C. § 17, 29 U.S.C. § 52), and later, the Norris-LaGuardia Act (29 U.S.C. § 101 *et seq.*).[4] These statutes were intended to "immunize labor unions and labor disputes from challenge under the Sherman Act." *H.A. Artists*, 451 U.S. at 713; *see Jou-Jou Designs v. Int'l Ladies Garment Workers Union*, 643 F.2d 905, 910 (2d Cir. 1981) (when the "Clayton Act was interpreted restrictively by the courts, Congress reaffirmed in the Norris-LaGuardia Act its earlier intent to exempt most labor activity from the anti-trust laws").

This "statutory labor exemption" protects union activity from any antitrust claim so long as the union is (i) acting in its legitimate self-interest and (ii) not conspiring with non-labor groups (namely, employers). *H. A. Artists*, 451 U.S. at 714; *Hutcheson*, 312 U.S. at 232.

---

[4] Section 6 declares that the "labor of a human being is not a commodity" and immunizes antitrust liability for unions "lawfully carrying out [their] legitimate object[ives]." 15 U.S.C. § 17. Section 20 immunizes strikes, "ceasing to perform any work or labor," and "ceasing . . . to employ any party," 29 U.S.C. § 52, as well as "recommending, advising, or persuading others by peaceful and lawful means so to do." *Id.* The Norris-LaGuardia Act bars a broad swatch of federal-court labor injunctions and has been read by the Supreme Court as an exemption from the antitrust laws. *H.A. Artists*, 451 U.S. at 714.

Although other antitrust exemptions may be construed narrowly, Pl. Br. at 22 (citing *non*-labor exemptions only), courts broadly apply the statutory exemption because it does not merely displace antitrust law, but serves to *promote* federal labor law. *E.g.*, *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236 (1996) ("Congress intended the labor statutes . . . to adopt the view[]" that the "statutory labor exemption" be "interpret[ed] broadly"); *H.A. Artists*, 451 U.S. at 714 (exemption has been "interpreted broadly" to stop courts from "interfer[ing] in labor disputes"); *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539–40 (1983) (federal policy reflects "a broad labor exemption from the antitrust laws").[5]  And because of this broad interpretation, *contra* Pl. Br. at 22, courts, including in this Circuit, routinely (and even before *Iqbal/Twombly*

---

[5] *E.g.*, *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982) ("Congress deliberately included a broad definition [of 'labor dispute'] to overrule judicial decisions that had unduly restricted the Clayton Act's labor exemption from the antitrust laws."); *Hurley v. Nat'l Basketball Players Ass'n*, No. 22-3038, 2022 WL 17998878, at *1 (6th Cir. Dec. 30, 2022) (statutory exemption is "broad"); *Mid-Am. Regional Bargaining Ass'n v. Will Cnty. Carpenters Dist. Council,* 675 F.2d 881, 884-85 (7th Cir. 1982) (labor exemptions are a "comprehensive exemption from antitrust liability for union activity" and statutory exemption has a "broad scope").

heightened the pleading standard) dismiss antitrust claims on the

pleadings based on the statutory exemption.[6]

Moreover, because overcoming the statutory exemption is

"an element of any claim that unions violated the antitrust laws,"

Drabinsky had the burden to plead facts plausibly showing that the

exemption does not apply—a burden he did not come close to satisfying.

*USS-POSCO Indus.*, 31 F.3d at 805 n.3; *Mid-Am. Reg'l Bargaining*

*Ass'n*, 675 F.2d at 890 (plaintiff "failed to properly allege a conspiracy

between the defendants . . . that would remove the complained of acts

from the . . . statutory labor exemption").

---

[6] *See, e.g., Hurley*, 2022 WL 17998878, at *1; *Jou-Jou Designs*, 643 F.2d at 910; *Mid-Am. Regional Bargaining Ass'n,* 675 F.2d at 886-90; *Dickey v. Nat'l Football League*, No. 17-CV-12295-IT, 2018 WL 4623061, at *6 (D. Mass. Sept. 26, 2018), *aff'd*, 2020 WL 6819135 (1st Cir. Feb. 13, 2020); *Roman Restoration, Inc. v. Operative Plasterers' & Cement Masons' Int'l Ass'n, Local No. 8*, No. 07-CV-2991 (RBK), 2008 WL 2684350, at *2-3 (D.N.J. June 30, 2008); *Colfax Corp. v. Ill. State Toll Highway Auth.*, No. 93-CV-7463, 1994 WL 444882, at *9-10 (N.D. Ill. Aug. 16, 1994); *Warnick v. Washington Educ. Ass'n*, 593 F. Supp. 66, 67, 70 (E.D. Wash. 1984); *Tuvia Convalescent Center, Inc. v. National Union of Hosp. & Health Care Emps.,* 553 F. Supp. 303, 307 (S.D.N.Y. 1982).

### B. The Complaint Makes Clear That Equity Put Drabinsky on the Do Not Work List out of Legitimate Self-Interest

#### 1. Drabinsky's Allegation of a "Boycott" Concerning Working Conditions Is Squarely Within the Union's Legitimate Self-Interest

To qualify for protection under the statutory labor exemption, a union's activities must merely "bear a reasonable relationship to a legitimate union interest." *Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n*, 640 F.2d 1368, 1380 (1st Cir. 1981). A union's "self-interest" is synonymous with the "legitimate objects' of organized labor," *Republic Prods., Inc. v. Am. Fed'n of Musicians*, 245 F. Supp. 475, 481 (S.D.N.Y. 1965), or stated differently, "the interests of its members." *Intercontinental Container*, 426 F.2d at 887 & n.2.

So long as "the union's action is intended to serve the interests of its members it is no proper concern of the courts whether the action is that best adapted to suit its purpose." *Id.* at 887 n.2. "[T]he licit and the illicit under § 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." *Hutcheson*, 312 U.S. at 232; *e.g.*, *H.A. Artists*, 451 U.S. at 715. Instead, when

28

considering whether a union is pursuing its legitimate interest, courts focus on whether the challenged conduct is a "traditional union activity," that is related to "traditional union ends." *USS-POSCO*, 31 F.3d at 808-09.

The Clayton Act specifies various traditional union activities that are shielded from antitrust liability, including "terminating any relation of employment," "ceasing to perform any work or labor," and "recommending, advising, or persuading others" to engage in such activities or "abstain from working." 29 U.S.C. § 52. The Norris-LaGuardia Act similarly specifies that "[c]easing or refusing to perform any work" and the "[a]dvising . . . of an intention" to do the same are antitrust exempt from injunctive relief. 29 U.S.C. § 104(a), (g).

Consistent with these statutory principles, courts uniformly hold that strikes, boycotts, and other forms of withholding labor are traditional union activities exempt from the antitrust laws. *E.g.*, *Hunt*, 325 U.S. at 823-24 (boycott of employer); *Hutcheson*, 312 U.S. at 233 (efforts to get union members to "refuse to work"); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 513 (1940) (violent strike); *Clarett v. Nat'l Football League*, 369 F.3d 124, 130 n.11 (2d Cir. 2004) (statutory

exemption "shields from the antitrust laws certain unilateral conduct of labor groups such as boycotts"); *Checker Taxi Co. v. Nat'l Prod. Workers Union*, 113 F.R.D. 561, 566 (N.D. Ill. 1986) (employer boycott for purpose of improving wages and working conditions is "the paradigmatic example" of when statutory exemption applies); *Republic Prods.*, 245 F. Supp. at 479 (exemption applies to a strike even where benefit to employees "would have been nominal" or "at best indirect"). These traditional union activities are entitled to "special protection," *USS-POSCO*, 31 F.3d at 808 & n.7, and when a work stoppage or refusal to work is involved, it "will be presumed to be in pursuit of the union's legitimate interest absent a very strong showing to the contrary." *Id.*

Here, Drabinsky's allegations place Equity squarely within the precedents establishing that an employer boycott falls within a union's legitimate self-interest. As the District Court correctly held (SA-8–9), the Complaint's allegations, and the documents incorporated-by-reference therein, establish that Equity acted in its legitimate self-interest because it used a traditional labor tactic (a Do Not Work List) to achieve a traditional labor objective (addressing members' complaints

about wages and working conditions).  Accordingly, "the wisdom or unwisdom, the rightness or wrongness," *Hutcheson*, 312 U.S. at 232, of Equity putting Drabinsky on the Do Not Work List was beyond the purview of the District Court because the Complaint confirms that Equity's "action [was] intended to serve the interests of its members." *Intercontinental Container*, 426 F.2d at 887 n.2.

Drabinsky *affirmatively pleads* that Equity's "boycott" addressed its members' complaints about the production's work environment and failure to pay wages and benefits required by the CBA.  A-72 (¶189), 122-26 (Ex. 39A).  The letter from the cast of *Paradise Square*, which is quoted in the Complaint, *see* A-72 (¶189), and attached as an exhibit, *see* A-126, states that, "due to outstanding payments and benefits, and a continued pattern of abuse and neglect that created an unsafe and toxic work environment, the company of 'Paradise Square' call for Garth H. Drabinsky to be placed on the Actors' Equity Do Not Work list."  A-126.  Per the Complaint, Equity responded that it would add Drabinsky to the List because he did not "uphold the terms of a union contract."  A-123.

If that were not enough to demonstrate that Equity was pursuing legitimate labor objectives, the Union also filed numerous grievances in which Equity established that Drabinsky's productions repeatedly violated the CBA. *Supra* pp. 11-12 & A-111, 143-48; *see also* SA-8–9 (holding that on the "face of the Complaint," Equity served the "interests of its members" by barring actors from working with Drabinsky).

Putting individuals or businesses on do-not-work lists—like strikes and other work stoppages—is quintessential union activity. *See, e.g.*, *Hunt*, 325 U.S. at 823-24 (boycott of employer); *United Bhd. Of Carpenters & Joiners of Am. v. Sperry*, 170 F.2d 863, 868 (10th Cir. 1948) (promulgation and circulation of employer blacklist); *Elliott v. Amalgamated Meat Cutters & Butcher Workmen of N. Am.*, 91 F. Supp. 690, 697 (W.D. Mo. 1950) ("[A]n 'Unfair List' is a protected activity of a labor organization."); *Grauman Co.*, 87 NLRB 755, 756-57 & n.1 (1949) (placing employer on "unfair list" to prevent employees from working for it is lawful and a "traditional direct" activity in support of a labor dispute), *enf. denied on other grounds*, 186 F.2d 326 (1950). Such traditional union conduct is protected by the statutory labor exemption.

*See* 29 U.S.C. § 52 (union advising to cease work or "to abstain from working"); 29 U.S.C. § 104(a), (g) (advising of intent to cease work); *Hunt*, 325 U.S. at 823-24 (boycott of employer); *HBO v. Directors' Guild of Am*, 531 F. Supp. 578, 583-84 & n.3, 603 (S.D.N.Y. 1982) (union had "legitimate interest in preventing" its members from working for producer who was placed on do-not-work-list equivalent); *LK Prods., Inc. v. Am. Fed'n of Television & Radio Artists*, 475 F. Supp. 251, 271 (S.D. Tex. 1979) (placing producer on "unfair list" exempt under statutory exemption).

Drabinsky does not seriously contest that the use of a do-not-work list is a "traditional union activity." He nevertheless argues that the "means" Equity used—a purported "lifelong boycott" of Drabinsky in any producing capacity in any entertainment field—is not "necessary" to serve Equity's self-interest. Pl. Br. at 31-35. But the Ninth Circuit case he relies on for this "necessary" standard—*USS-POSCO*, 31 F.3d at 808-09—holds that it applies only when the union engages in "non-traditional" activity. *Id.* at 809. When the union engages in traditional activities—including specifically "work stoppage[s]," *id.* at 808 n.7 or a "group boycott," *id.* at 808—then it will be "presumed to be in pursuit of

the union's legitimate interest" without any consideration of whether

the action was "necessary." *Id.* at 808-09. In any event, in the Second

Circuit, it is irrelevant whether the union's action "is that best adapted

to suit its purpose." *Intercontinental Container*, 426 F.2d at 887 n.2.

The District Court properly applied these principles in

holding that Drabinsky's antitrust claims were precluded by the

statutory exemption. Equity was free to direct its members to "sell or

not sell their labor as they please, and upon such terms and conditions

as they choose, without infringing the [antitrust] laws." *Hunt*, 325 U.S.

at 824.

### 2. Drabinsky's Arguments on Appeal are Unpersuasive

Against the weight of these precedents, Drabinsky advances

three arguments that cannot be reconciled with his own Complaint or

governing law.

***First***, according to Drabinsky, the District Court's

conclusion that he was placed on the Do Not Work List in response to

the cast's concerns about wages and working conditions is based on

facts "outside the complaint." Pl. Br. at 2, 26-31. But the Complaint

affirmatively pleads that the cast sent the letter requesting that

Drabinsky be placed on the Do Not Work List "due to outstanding payment and benefits, and a continued pattern of abuse and neglect that created an unsafe and toxic work environment." A-72 (¶189), 126 (Ex. 39A). On appeal, Drabinsky *now* refers to the cast's letter as one that was "purportedly" sent (Pl. Br. at 14), but he may not rewrite his own pleading. *See Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) ("suggest[ion]" in plaintiffs' "brief on appeal" cannot save antitrust claims where "allegations in their complaints reveal otherwise").

Nor may Drabinsky re-cast *his* allegations that Equity placed him on the Do Not Work List to address the concerns in the cast's letter. A-72 (¶¶189-190), 122-26 (Ex. 39A). Drabinsky now argues that the Complaint "does not allege cause and effect" or explicitly say that Equity placed him on the List after receiving the letter. Pl. Br. at 18, 29-30. But this argument cannot be squared with the only plausible conclusion to be drawn from the Complaint's allegations—that Equity received the letter and placed Drabinsky on the List to address the cast's concerns. A-72 (¶¶189-190); A-122 ("Actors' Equity said it plans to put producer Garth Drabinsky on the

'Do Not Work' List *after Paradise Square* castmembers [sic] sent a letter speaking out against him.") (emphasis added); A-123 (Equity "intends to add" Drabinsky to List "immediately after[]" the show closes "on July 17" because he was "unable to uphold the terms of a union contract"); *see King v. City of New York*, No. 22-231, 2023 WL 2398679, at *2 (2d Cir. Mar. 8, 2023) (dismissing complaint where, in the face of "bare" and "conclusor[y]" allegations imputing an unlawful motive, an "obvious alternative explanation" was available); *Hurley*, 2022 WL 17998878, at *1 (statutory exemption applied despite conclusory allegations that union's conduct was "pretextual" and union "did not want" plaintiff to work).[7]

In any event, application of the statutory labor exemption does not require any showing of "cause and effect" between the letter from the cast and Drabinsky's placement on the List. To stave off dismissal under the statutory exemption, Drabinsky must affirmatively

---

[7] Other assertions in Appellant's brief are similarly implausible. For example, Drabinsky claims that, when Equity filed the hostile work environment grievance in response to his use of a racial slur, the "cast" did not feel hostility. Pl. Br. at 31 (citing A-107). But the stated purpose of the grievance was to vindicate the collectively-bargained rights of the Union and the "safety of our members." A-107.

plead facts plausibly showing that placing him on the List was not a traditional union activity related to the cast's interests in protecting wages and working conditions. *See Hutcheson*, 312 U.S. at 232; *Hunt*, 325 U.S. at 824; *Intercontinental Container*, 426 F.2d at 887 n.2. His Complaint offers no facts capable of plausibly satisfying this burden. *See Lekettey v. City of New York*, 637 F. App'x 659, 662 (2d Cir. 2016) ("conclusory assertion" of "pretext" insufficient to survive a motion to dismiss).

       ***Second***, Drabinsky argues that his placement on the Do Not Work List was not justified by a legitimate union self-interest because, as the "lead creative producer," he was "not responsible" for wages and working conditions. Pl. Br. at 2, 27, 32; *see* A-72–73 (¶¶190-91). But whether Drabinsky was singularly responsible for wages and working conditions on the Production is irrelevant to applying the statutory exemption because, as discussed above (*supra* pp. 28, 31), the "wisdom" or "rightness" of the Union's conduct in addressing member concerns is beyond judicial review. Moreover, the fact that Drabinsky was not the employer of record is also irrelevant because union conduct related to a "labor dispute" is immune from antitrust scrutiny "regardless of

whether or not the disputants stand in the proximate relation of employer and employee."  29 U.S.C. §§ 104, 113(c).

That said, the Complaint's allegations establish that Drabinsky had extensive influence over whether and how much the cast would be paid, and how their job site would be run.  *Supra* pp. 7-10.  To give only two of a litany of examples, the Complaint alleges that Drabinsky: (i) controlled the making of the cast album, A-12 (¶iii), which contributed a significant part ($139,979) of the outstanding money owed to Equity members as of July 14, 2022, A-147 (¶J); and (ii) "instructed" and "approved" overtime work.  A-69 (¶¶178, 180). Regardless of whether Drabinsky was writing the checks, he affirmatively pleads his influence over wages and working conditions.[8]

--------

[8] Indeed, given Drabinsky's allegations that he was the "lead creative producer" for *Paradise Square*, acted "on behalf of" the Production, and exerted extensive influence over the cast's conditions of employment, *see supra* pp. 7-10, Drabinsky *was* the cast's employer under the National Labor Relations Act, either as an agent for, or joint employer with, the Production.  *See* 29 U.S.C. § 152(2) ("employer" includes "any person" acting as the employer's "agent"); *Browning-Ferris Indus. of Cal., Inc. v. N.L.R.B.*, 911 F.3d 1195, 1209 (D.C. Cir. 2018) (joint-employer inquiry asks, *inter alia*, whether individual exerts significant control over employees).

***Third***, Drabinsky contends that the District Court should not have resolved whether Equity "intended to serve a legitimate self interest," as this is an "intent" issue and a "factual dispute." Pl. Br. at 2, 22, 26, 36-38. Essentially, Drabinsky argues that any antitrust plaintiff can overcome the statutory labor exemption at the pleading stage merely by making conclusory assertions about animus and speculating about a union's state of mind. This is not the law.

The application of the statutory exemption is determined by whether the Complaint allegations plausibly show that putting Drabinsky on the Do Not Work List did not bear a reasonable relationship to the Union's legitimate interest in taking actions to protect the wages and working conditions of its members. *Hutcheson*, 312 U.S. at 232; *Intercontinental Container*, 426 F.2d at 887 n.2. That is especially true here, where Equity did so by employing a "traditional union activity" to achieve a "traditional union end[]." *USS-POSCO*, 31 F.3d at 808-09. Applying these well-established principles, the Complaint does not, as a matter of law, offer any factual allegations to stave off dismissal under the statutory exemption.

Drabinsky makes the conclusory assertion that Equity "had no basis" to place him on the Do Not Work List because he was not the employer of record, and thus Equity must have acted out of personal animus.  A-72–73 (¶¶190-91), 85 (¶237).  This is a *non-sequitur* resting on implausible speculation prohibited by *Twombly*.  *See Francis v. Kings Park Manor, Inc.,* 992 F.3d 67, 74 (2d Cir. 2021) (on motion to dismiss, assuming animus would be "to indulge the speculative inference"); *Balintulo v. Ford Moto Co.*, 796 F.3d 160, 170 (2d Cir. 2015) ("conclusory" allegations regarding defendant's state of mind "fail[] to establish even a baseline degree of plausibility").

But even *if* the Complaint contained plausible factual allegations that Equity was motivated by personal animus against Drabinsky, his antitrust claims would still be precluded by the statutory exemption under the Supreme Court's ruling in *Hunt*, 325 U.S. at 823-25.  There, a union directed its members (truck drivers) to refuse to work for a potential employer (a trucking company) "due to personal antagonism"; the trucking company thus had no drivers and went out of business.  *Id.* at 823-24.  The Supreme Court held that even such a personally antagonistic motive does not expose the union to

antitrust scrutiny because "[i]t is not a violation of the Sherman Act for laborers in combination to refuse to work[,]" "[t]hey can sell or not sell their labor as they please," and Congress "manifested no purpose to make *any kind* of refusal to accept personal employment a violation of the Anti-trust laws." *Id.* at 824-25 (emphasis added); *see also Jacksonville Bulk Terminals*, 457 U.S. at 704, 715-19 (holding that even "politically motivated work stoppages" are protected by Section 4 of Norris-LaGuardia); *Republic Prods.*, 245 F. Supp. at 482 (it makes no difference "how outrageous the union's conduct was from a moral point of view," even if the union action was, as in *Hunt*, undertaken against the employer "purely out of personal spite and vindictiveness").

Appellant's attempts to distinguish *Hunt* are unavailing. Pl. Br. at 36-37. That *Hunt* was decided after trial does not mean its holding does not apply at the pleading stage. And Drabinsky is wrong that the *Hunt* employer was boycotted because of a refusal to comply with wage and hour conditions in the CBA. The employer there desired to agree to the CBA terms, and the union refused to do so solely out of animus (the union believed, despite an acquittal, that the employer had killed a union member during a prior strike). *Hunt*, 325 U.S. at 822-24;

*see id.* at 827 (Roberts, J., dissenting) (union "decided to punish" employer by "forbidding the members . . . to work for them" with "no suggestion in the record that they did so because of any labor conditions or considerations").[9]

The other cases that Drabinsky relies upon for his "intent" argument (Pl. Br. at 22-23) are also distinguishable.  To the extent *Allied International*, 640 F.2d at 1380, held that a politically motivated boycott may fall outside the exemption, that holding did not survive the Supreme Court's later decision in *Jacksonville Bulk Terminals*, which held that "politically motivated work stoppages" are protected.  457 U.S. at 704; *see Confederacion Hipica de Puerto Rico, Inc. v. Confederacion de Jinetes Puertorriquenos, Inc.*, 30 F.4th 306, 316 (1st Cir. 2022) (citing *Jacksonville Terminals* for proposition that as "long as an employee-employer relationship—broadly understood—is at the core of the controversy, as here, then any political motivations for a work stoppage

---

[9] Drabinsky is also incorrect that *Am. Fed. of Musicians v. Carroll*, 391 U.S. 99 (1968), undermines *Hunt*'s holding.  Pl. Br. at 37. That case did not address *Hunt's* holding regarding the refusal to accept employment but involved instead whether certain lead musicians were considered a non-labor group.  *See infra* pp. 45-46.  In any event, *Carroll* cites *Hunt* with approval.  391 U.S. at 107.

would not take a dispute out of the labor exemption").  In any event, *Allied International* involved a boycott over a "political dispute with the Soviet Union" that lacked any link to terms and conditions of employment, and the court there still dismissed the claim on the pleadings because "it would be a rare case when . . . a mere refusal to work by members of a labor union" could violate the Sherman Act.  640 F.2d at 1369, 1380-81.

The decision cited by Drabinsky from *AMA v. United States*, 317 U.S. 519 (1942), did not even involve a union, let alone "concern[] terms and conditions of employment."  *Id.* at 533.  Rather, *AMA* involved the actions of independently practicing physicians who were not unionized and had no ability to invoke the statutory exemption.  *Id.* at 535-36.  And the decision in *N.L.R.B. v. Red Top, Inc.*, 455 F.2d 721 (8th Cir. 1972), had nothing to do with the antitrust laws or the statutory labor exemption.

## C. The Complaint Does Not Plausibly Allege that Equity Combined with a Non-Labor Group

Drabinsky also failed to plausibly allege that Equity conspired with any non-labor group.  *H. A. Artists*, 451 U.S. at 714.  Drabinsky alleges that, upon "information and belief, some members of

43

AEA, and some members of [the other 4A unions], are also producers," and that these unidentified persons would "specifically benefit" from placing Drabinsky on the Do Not Work List. A-75 (¶197). But even if this were true, the Complaint does not allege *any* facts to plausibly support a claim that these unidentified member-producers acted in concert **with Equity to place Drabinsky on the List**. This is fatal for Drabinsky's antitrust claims. *H. A. Artists*, 451 U.S. at 714; *Darby v. Greenman,* 14 F.4th 124, 130 n.6 (2d Cir. 2021) (on a motion to dismiss, "we are not free to speculate about unpleaded facts").

This gaping void in Drabinsky's pleading is underscored by his brief on appeal. According to Drabinsky, the Complaint alleges that member-producers "may constitute a 'non-labor group,'" there is "[n]o doubt" such members exist, and "Bette Midler, Whoopi Goldberg, and Cher" are hypothetical examples. Pl. Br. at 40-41. This argument makes Equity's point: Bette Midler, Whoopi Goldberg, and Cher are not alleged to **have conspired with Equity to put Drabinsky on the Do Not Work List** (indeed, they are not even mentioned in the Complaint). Drabinsky's bald claim of collusion between member-producers and Equity is implausible speculation and cannot withstand

a motion to dismiss. *E.g.*, *Twombly*, 550 U.S. at 555, 564 (factual allegations of antitrust conspiracy did not rise above a "speculative level"); *Mid-Am. Regional Bargaining Ass'n,* 675 F.2d at 886 & n.13 (even pre-*Twombly*, dismissing antitrust claim based on statutory exemption because court would not "infer a conspiracy" based on "conclusory allegations unsupported by factual assertions"); *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) (conspiracy claims were "conclusory, speculative, and implausible"); *Yamashita*, 936 F.3d at 106 ("speculative, indefinite allegations" insufficient to survive motion to dismiss).

Finally, although this Court need not reach the issue, the District Court also correctly concluded that member-producers do not meet the definition of a non-labor group because they act in an "economic interrelationship" with, and in job competition with, Equity members who are actors only. SA-13–14; *Carroll*, 391 U.S. at 106 (orchestra leader who also plays instrument is still a member of labor group because of the "economic inter-relationship" between the leader and musicians); *see H.A. Artists*, 451 U.S. at 717 n.21 (although

employers are non-labor group, an "exception has been recognized . . . when the employer himself is in job competition with his employees").

## III. PLAINTIFF'S STATE LAW CLAIMS ALSO FAIL

### A. *Martin v. Curran* Bars All of the State Law Claims

#### 1. The Complaint Does Not Plausibly Allege that Each of Equity's 50,000 Members Authorized or Ratified the Alleged Misconduct

For more than seventy years, it has been settled law in New York that a plaintiff cannot assert a claim against an unincorporated voluntary association for "breaches of agreement or . . . tortious wrongs" unless they can prove the "individual liability of every single member" of the association. *Martin*, 303 N.Y. at 282. In 2014, the New York Court of Appeals reaffirmed *Martin* and rejected "plaintiff's invitation to overrule" it, holding that, to bring a tort claim against a union that is a voluntary association, the plaintiff must "plead and prove that each member of the union authorized or ratified the alleged wrongful conduct." *Palladino v. CNY Centro*, 23 N.Y.3d 140, 147, 150-52 (2014) (explaining that whatever the "continued utility or wisdom of the *Martin* rule," it is for the legislature, not the courts, to modify).

Appellant's repeated argument that *Martin* is "widely criticized," *e.g.*, Pl. Br. at 3, is as revealing as it is irrelevant. Federal

46

courts are "bound to apply New York law as determined by the New York Court of Appeals." *Global Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 101 (2d Cir. 2021). Thus, as this Court has recognized, state law claims brought in federal court against unincorporated associations, including those "sounding in tort," are limited to cases "where the individual liability of every single member can be alleged and proven." *Morrissey v. Nat'l Mar. Union of Am.*, 544 F.2d 19, 33 (2d Cir. 1976). This creates an "onerous and almost insurmountable burden on individuals seeking to impose liability on labor unions." *Modeste v. Local 1199*, 850 F. Supp. 1156, 1168 (S.D.N.Y. 1994) (Sotomayor, J.), *aff'd*, 38 F.3d 626 (2d Cir. 1994). As a result, courts in this Circuit regularly dismiss New York law claims where the plaintiff fails plausibly to allege that every union member authorized or ratified the challenged conduct. *See, e.g.*, *Morrissey*, 544 F.2d at 34 (dismissing malicious prosecution claim under *Martin*); *Performing Arts Ctr. of Suffolk Cnty. v. Actors' Equity Ass'n*, No. 20-CV-2531 (JS) (AYS), 2022 WL 16755284, at *5-6 (E.D.N.Y. Aug. 25, 2022) (dismissing fraud and unjust enrichment claims against Equity under *Martin*), *adopted*

*by*, 2022 WL 4977112 at *4 (Sept. 30, 2022); *Moleon v. Alston*, No. 21-CV-1398 (PAE), 2021 WL 5772439, at *11 (S.D.N.Y. Dec. 3, 2021).

Appellant cannot overcome this daunting burden. Drabinsky does not dispute that Equity is an unincorporated association. Drabinsky also does not allege any facts to plausibly show the "individual liability" of "every single" Equity member, *e.g.*, that each member knowingly ratified his (ostensibly) unlawful placement on the Do Not Work List. *Martin*, 303 N.Y. at 282.[10] The District Court thus correctly dismissed the New York claims. SA-5–8.

To be sure, Drabinsky *does* allege that the cast of *Paradise Square* asked Equity to place him on the Do Not Work List, *see* A-126 (Ex. 39A), but that is a far cry from plausibly alleging that the other 50,000 Equity members knew about and authorized Equity's decision to do so. Even a union campaign with "broad support"—facts not alleged here—would not satisfy *Martin*'s stringent requirements. *Bldg. Indus.*

---

[10] This is the only conduct that Plaintiff even argues satisfies the *Martin* rule. *See* Pl. Br. at 19, 46-47 (*not* arguing that the October 25 hostile work environment grievance or any other alleged conduct meets the *Martin* standard).

*Fund v. Local Union No. 3*, 992 F. Supp. 192, 195 (E.D.N.Y. 1996), *aff'd*
141 F.3d 1151 (2d Cir. 1998).

Similarly, as to ratification, Drabinsky does not (and cannot)
plausibly allege that each of Equity's members viewed Plaintiff's name
on the Do Not Work List. Such averments would, in any event, be
insufficient. Under *Martin*, Plaintiff must plausibly allege that every
single Equity member had "full knowledge" of the "specific [allegedly
unlawful] acts in question." 303 N.Y. at 282. Here, that includes not
only Drabinsky's placement on the List, but that doing so was somehow
wrongful. *See* A-72–73 (¶¶190-91). Without allegations that each of
Equity's 50,000 members was aware of all the "material facts,"
Drabinsky cannot overcome *Martin*. *See A. Terzi Prods., Inc. v.
Theatrical Protective Union*, 2 F. Supp. 2d 485, 492 (S.D.N.Y. 1998)
(that union members knew about collective bargaining agreement did
not plausibly indicate that they had "full knowledge" of the allegedly
tortious conduct used to obtain the agreement).

An online article and Equity publishing the Do Not Work
List on its website do not change this conclusion. As the Court of
Appeals held in *Martin*, allegations that defamatory statements have

been widely disseminated "fall far short of asserting that the union members themselves authorized or ratified the particular libels." 303 N.Y. at 279-80. Plaintiff's assertion that his placement on the Do Not Work List was "published in some of the most widely read industry publications," *see* Pl. Br. at 47, thus does nothing to satisfy his "almost insurmountable" burden. *See, e.g.*, *Martin*, 303 N.Y. at 279-80 (dismissing libel claim even though allegedly defamatory newspaper was the "union's official organ" and had a "circulation of about 125,000 copies"); *Duane Reade Inc v. Local 338 Retail, Wholesale, Dep't Store Union*, 791 N.Y.S.2d 288, 289-91 (N.Y. Sup. Ct. 2004) (dismissing defamation claim under *Martin* even though the plaintiff alleged that the union posted defamatory statements on its highly publicized website).

Nor is it even plausible to infer that, simply because there is a membership rule against working for non-union employers, *every one* of Equity's members viewed Drabinsky's name on the Do Not Work List. *See* Pl. Br. at 46. The Complaint offers no facts to support the assumption that retired members, members working in other industries or different countries, or members committed to a single, long-term

production would have any reason to view—much less ratify and authorize—the Do Not Work List.

To satisfy its burden under *Martin*, Drabinsky was required to allege facts plausibly showing that "every single" member "unanimous[ly]" "participat[ed]" in the publication of the List with "full knowledge" of the relevant facts, as silent acquiescence (*see* Pl. Br. at 47) is insufficient. *See Palladino*, 23 N.Y.3d at 148; *Martin* 303 N.Y. at 280, 282. The Complaint is devoid of any such allegations, and the New York claims were thus properly dismissed. *See Sullivan v. N. Babylon Union Free Sch. Dist.*, No. 15-CV-0834 (JS) (SIL), 2016 WL 11673810, at *7 (E.D.N.Y. Mar. 21, 2016) (no ratification without allegation that union "voted or took similar action").

### 2. *Martin* Defeats the Negligence Claim

#### (a) *Martin* Applies to the Negligence Claim Because it Sounds in Intentional Conduct

Drabinsky argues for the first time on appeal that *Martin* does not apply to negligence claims, and that the District Court improperly "[l]umped" the negligence and intentional tort claims together. Pl. Br. at 44-45. The District Court, however, correctly "lumped" the counts together *in this case* because the "negligence" claim

rests on the *same exact intentional conduct* as the intentional tort and defamation claims.

Specifically, the negligence claim allegedly arises from Equity's purposeful "inclusion [of Plaintiff] on the Blacklist," A-80 (¶218), and Equity's "wrongful campaign of harassment and abuse" and "publishing [of] untruthful statements." A-80 (¶220). The intentional tort claim is based upon the exact same conduct: the "posting of Drabinsky on its 'Do Not Work' Blacklist," "an intentional campaign of harassment and abuse," and the "publishing [of] untruthful statements." A-79 (¶214); *see also* A-78 (¶206) (defamation claim arising from same conduct). Plaintiff's "negligence" claim thus challenges *intentional* conduct, rendering it indistinguishable under *Martin* from Drabinsky's other tort claims.

New York law makes it clear that the courts must apply *Martin* to dismiss negligence claims where, as here, they are based on allegations of intentional conduct. *See Salemeh v. Toussaint ex rel. Local 100 Transp. Workers Union*, 810 N.Y.S.2d 1, 2 (1st Dep't 2006) (although "labeled as sounding in negligence," state law claims were barred by *Martin* because their "essence" was an intentional tort);

*Kreutzer v. East Islip Union Free School Dist.*, 2015 WL 9254522, at *3 (N.Y. Sup. Ct. Dec. 2, 2015) (negligence claim dismissed under *Martin* where it was "clearly rooted" in breach of contract claims).

### (b) Appellant Forfeited His Argument Against Applying *Martin* to the Negligence Count

Where a plaintiff "is represented by counsel before the district court," they "must present the relevant legal arguments in that forum in order to preserve them for appellate review." *Doe v. Trump Corp.*, 6 F.4th 400, 410 (2d Cir. 2021). Raising a claim in a footnote—or "typing out the key words" without "offering any argument or explanation"—is insufficient to preserve an issue for review. *Id.*; *N.Y.S. Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 128 n.3 (2d Cir. 2015). Although this Court has discretion to consider a new argument on appeal, the "circumstances normally do not militate in favor of an exercise of discretion . . . where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 615 (2d Cir. 2016).

Drabinsky did not argue below that *Martin* does not apply to negligence claims, *see* Docket No. 42, and there is no justification (and

Drabinsky offers none) for his failure to do so. Thus, Drabinsky's argument should be forfeited on appeal. *See, e.g.*, *Mhany*, 819 F.3d at 615-16 (failure to raise legal argument in district court results in forfeiture).[11]

## B. Drabinsky's Negligence Claim Should be Dismissed for Three Alternative Reasons

Even if *Martin* did not bar Drabinsky's negligence claim, that outcome should be affirmed on three alternative grounds.

### 1. The Negligence Claim is Subsumed by the Intentional Tort and Defamation Claims

Under New York law, a negligence claim fails as a matter of law when it asserts only intentional conduct. *See, e.g.*, *United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353-54 (2d Cir. 1993) (intentional conduct and negligent conduct "are contradictory," and negligence claim

---

[11] Drabinsky also did not raise below and thus forfeited the arguments that *Martin* should no longer be followed, Pl. Br. at 48, and that this Court should create a "delegation" exception to *Martin*, *id.* at 50. These arguments are also meritless in any event. It is only the New York Court of Appeals that may abandon or alter the *Martin* standard, *Global Reinsurance*, 22 F.4th at 101, *Morrissey*, 544 F.2d at 33, which it declined to do just a few years ago. *Palladino*, 23 N.Y.3d at 144, 150-51. Nor does this Court have the authority to create a broad "delegation" exception to *Martin*, Pl. Br. at 46, 50, that would change the ruling in *Martin* which "expressly excludes theories of agency or delegation." *Duane Reade*, 791 N.Y.S.2d at 291.

cannot proceed when based on intentional conduct); *Ziming Shen v. City of New York*, 725 F. App'x 7, 16 (2d Cir. 2018) (dismissing negligence claim based on intentional conduct); *Fernandez v. Fernandez*, 189 N.Y.S.3d 538, 541 (2d Dep't 2023) (dismissing negligence claim because it was "premised only on allegations of intentional conduct, which cannot form the basis of a negligence claim"); *Morrow v. MetLife Invs. Ins.*, 113 N.Y.S.3d 421, 423 (4th Dep't 2019) (same).

Here, as discussed above, *supra* p. 52, Drabinsky's negligence claim arises from the identical intentional conduct that forms the basis of his other tort claims. The allegations thus fail to state a claim for negligence as a matter of law. *E.g.*, *United Nat. Ins. Co.*, 988 F.2d at 354; *Ziming Shen*, 725 F. App'x at 16.

Moreover, to prevent plaintiffs from "plead[ing] around constitutional and statutory defamation defenses," *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 189-90 (S.D.N.Y. 2021), New York courts keep a "watchful eye for claims sounding in defamation that have been disguised as other causes of action" and dismiss them. *Pusey v. Bank of Am., N.A.*, No. 14-CV-04979 (FB) (LB), 2015 WL 4257251, at *4 (E.D.N.Y. July 14, 2015); *see, e.g.*, *Olney v. Town of Barrington*, 118

N.Y.S.3d 898, 901 (4th Dep't 2020) (a "defamation cause of action is not transformed into one for negligence merely by casting it as such"); *Goldman v. Barrett,* 733 F. App'x 568, 570-71 (2d Cir. 2018) (dismissing intentional tort claim as duplicative of defamation claim); *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (same). Here, the negligence claim seeks the same damages ($50,000,000) as the defamation claim and is based on the same allegations, including Equity's alleged "intentional campaign of harassment and abuse," "publishing [of] numerous untruthful statements," and Drabinsky's placement on the Do Not Work List.  A-78–80 (¶¶206, 210, 218, 220-21). It thus should be dismissed for this alternative reason as well.

## 2. Drabinsky Failed to Plead a Duty of Care

The "existence of a duty is . . . a *sine qua non* of a negligence claim." *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000).  As a matter of law, "no liability can ensue" for negligence in the absence of such a duty.  *Id.*

Drabinsky alleges that Equity owed him a duty of care because Equity contracted with the Broadway Partnership, the producing entity for the Chicago production of *Paradise Square*, and

Drabinsky was the "lead creative producer" for the musical. A-79

(¶218). Under New York law, however, a "contractual obligation,

standing alone," will not give rise to a duty of care or tort liability

towards a third party absent limited exceptions not applicable here.

*Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 138, 140

(2002). Drabinsky cites no cases—and there are none—holding that a

union would owe such a duty of care capable of supporting a negligence

claim by an employer or "creative producer."

### 3. Federal Labor Law Preempts the Negligence Claim

Finally, all of Drabinsky's state law claims, including

negligence, are preempted by federal labor law. Under "*Garmon*"

preemption, *see San Diego Bldg. Trades Council v. Garmon*, 359 U.S.

236 (1959), states may not regulate activity that the NLRA "arguably

protects or prohibits." *Healthcare Ass'n of N.Y.S., Inc. v. Pataki*, 471

F.3d 87, 95 (2d Cir. 2006); *see Glacier Nw., Inc. v. Int'l Bhd. of

Teamsters Loc. Union No. 174,* 143 S. Ct. 1404, 1411 (2023).

Equity placing Drabinsky on the Do Not Work List would (at

a minimum) "arguably" be protected by the NLRA, and any state law

challenge to such conduct is thus preempted. The National Labor

Relations Board has held that, under the proviso to Section 8(b)(1)(A) of the Act,[12] unions may "lawfully maintain and enforce rules prohibiting members from working" for non-union employers. *Steven Stripling*, 316 NLRB 710, 711 (1995); *Millwright & Mach. Erectors*, 287 NLRB 545, 546 (1987). Equity's membership rule prohibiting actors from working for non-union employers is thus permissible under the NLRA, and the Do Not Work List, which merely alerts members to the non-union or defaulting status of identified employers, is likewise protected. *E.g.*, *HBO*, 531 F. Supp. at 583 & n.3, 603-04 (citing Supreme Court cases interpreting NLRA's application to do-not-work-list equivalent). Drabinsky's argument below—that placing him on the List amounted to "unreasonable" enforcement of Equity's rules, *see* Docket No. 42 at 11— shows exactly why this conduct is "arguably protected," as this is an issue that must be determined by the NLRB. *Cf. Millwright*, 287 NLRB at 546-47 (upholding enforcement of rule prohibiting non-union work).

Further, Drabinsky's claims are also preempted under Section 301 of the Labor-Management Relations Act ("LMRA"), 29

---

[12] The proviso to Section 8(b)(1)(A) states that a union has the right "to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U.S.C. § 158(b)(1)(A).

U.S.C. § 185.  Under Section 301, when resolution of a state-law claim is "substantially dependent upon" analysis of the terms of a CBA, the state-law claim is preempted by federal labor law.  *Whitehurst v. 1199 SEIU United Healthcare Workers E.*, 928 F.3d 201, 206 (2d Cir. 2019).  The underlying basis of Drabinsky's claims are all "substantially dependent upon" and related to alleged violations of the CBA.  For example, Drabinsky asserts New York law claims against Equity for: (i) placing him on the Do Not Work List because he breached the CBA, A-72 (¶189), 126 (Ex. 39A); (ii) filing a CBA grievance for a hostile work environment, which he claims was defamatory, A-41–42 (¶¶76, 78); and (iii) refusing to pursue allegations that a cast member engaged in sexual harassment in violation of the CBA, A-44–45 (¶¶85, 87-90).  None of these allegations could be adjudicated without determining whether the CBA was breached—*i.e.*, without "substantial analysis" of the CBA.  Accordingly, the negligence claim is likewise preempted by Section 301.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should affirm the dismissal below.

Dated: August 4, 2023

Respectfully submitted,

/s/ *Evan Hudson-Plush*
Evan Hudson-Plush
COHEN, WEISS and SIMON LLP
900 Third Avenue, 21st Floor
New York, New York 10022
(212) 356-0254
ehudson-plush@cwsny.com

/s/ *Jeffrey L. Kessler*
Jeffrey L. Kessler
David L. Greenspan
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-4698
jkessler@winston.com

*Attorneys for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because this brief contains 11,711 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional spaced typeface using Microsoft Office Word in 14-point Century Schoolbook.

Dated: August 4, 2023

/s/ *Evan Hudson-Plush*
Evan Hudson-Plush